**TEAM OBSOLETE LTD.,**
**et al., Plaintiffs,**

v.

**A.H.R.M.A. LTD., et al., Defendants.**

**No. 01–CV–1574 ILG.**

United States District Court,
E.D. New York.

March 24, 2003.

Steven Jay Harfenist, Friedman & Harfenist, Lake Success, NY, for plaintiffs.

Lilian A. Morvay, Milber, Makris, Plousadis & Seiden, LLP, White Plains, NY, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

Plaintiffs filed this action in March of 2001 making claims under the Sherman Act, the Racketeer Influenced and Corrupt Organizations Act, the Lanham Act, and California unfair competition laws, as well as other state law claims, against defendants A.H.R.M.A. Ltd. d/b/a American Historic Racing Motorcycle Association ("AHRMA"), and current and former named directors, officers, officials, or trustees of AHRMA (the "individual AHRMA defendants"), and claims under the Sherman Act and California unfair competition laws against the Bendelow Law Firm, f/k/a/ Bendelow & Darling P.C., and the American Motorcyclist Association ("AMA").

AHRMA, the individual AHRMA defendants, and AMA now move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Bendelow Law Firm moves to dismiss all claims against it pursuant to Rule 12(b)(6). AHRMA separately moves for sanctions pursuant to Rule 11. Bendelow Law Firm also moved under Rule 11, but has withdrawn that motion.

In response, plaintiffs seek leave to amend their complaint to withdraw their RICO claims with prejudice, to drop their claims against the individual AHRMA defendants (thereby creating complete diversity), and to amend certain factual allegations. Although the claims against the individual AHRMA defendants are dropped in the proposed amended complaint, the caption continues to list them. Presumably this is an oversight. Defendants oppose the amendment of the complaint as futile.[1]

For the reasons that follow, AMA's motion is granted with respect to the Sherman Act claims and with respect to the California

---

1. Plaintiffs had also cross-moved for costs and fees related to service pursuant to Fed.R.Civ.P. 4. The cross-motion has since been settled and withdrawn.

unfair competition claims of plaintiffs Team Obsolete, Ltd., Team Obsolete Products, Ltd., Team Obsolete Promotions, Inc., and Robert I. Iannucci, but otherwise is denied. AHRMA's motion is granted to the same extent as AMA's motion, and therefore the Sherman Act claims and the same California claims of the same plaintiffs are dismissed. AHRMA's motion is denied as to the remaining claims. AHRMA's Rule 11 motion is also denied. As to Bendelow Law Firm, the motion is granted and all claims are dismissed.

## BACKGROUND

Since plaintiffs seek leave to amend the complaint, the factual allegations in the proposed amended complaint ("Am.Compl.") will be taken as true for these motions. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir. 2002) (accepting as true for purposes of motions to dismiss all allegations in proposed amended complaint).

Plaintiffs Team Obsolete Ltd., Team Obsolete Products Ltd., and Team Obsolete Promotions, Inc. (collectively "Team Obsolete"), are New York corporations with a principal place of business located in Brooklyn, New York. Plaintiff Robert T. Iannucci ("Iannucci") is a resident of New York State and the President of Team Obsolete. The other named plaintiffs (the "individual riders") are individuals from other states or countries who either ride Team Obsolete motorcycles, ride on behalf of Team Obsolete in national races, or are otherwise associated with Team Obsolete. They include Jim Redman, MBE, a six-time Federation International de Motocyclisme ("F.I.M.") world champion; Don Vesco, who twice set the world land speed record for wheeled vehicles; Dave Roper, who has won Daytona over twenty times, has won many AHRMA national championships, and is the only American to ever win the Isle of Man race; Lon McCroskey, a surgeon who races his own collection of historic motorcycles; Erik Green, a well-known rider of historic motorcycles; and John Kain, also a rider of historic motorcycles.

In the late 1970's, Iannucci and Team Obsolete began organizing vintage motorcycle racing on paved closed circuit tracks. Most of these events were sanctioned by defendant American Motorcycle Association ("AMA"). AMA is an organization with about 270,000 members that "pursues, protects and promotes the interests of motorcyclists in the United States," and sanctions and promotes racing events. It is the largest general membership motorcycle organization in the world, and one of its divisions encompasses vintage motorcycle racing. AMA today promotes two historic racing events, Vintage Days at Mid–Ohio and Sonomafest at Sears Point, California. AMA also issues "Promoter Charters" to independent event promoters that permit them to stage events under AMA's sanction. AMA also provides insurance for participants in AMA sanctioned events under its ARMOUR policy. The lack of ARMOUR insurance at events not sanctioned by AMA allegedly discourages riders from competing.

As the sport of vintage motorcycle racing grew in popularity during the 1980's, Iannucci and Team Obsolete believed that a national body was necessary to administer the sport, and thus became founders of AHRMA. AHRMA is a not-for-profit organization organized under the laws of Ohio that conducts a large national and international program of vintage motorcycle racing and has about 5000 members. Iannucci helped create AHRMA in order to standardize racing rules and classes to permit racers to participate in different events while working towards a nationally recognized point tally that would in turn encourage the sport of racing and facilitate its promotion.

AHRMA is the only vintage motorcycle racing association in the United States that conducts a national competition series. In other words, anyone who wants to compete for a national title in vintage motorcycling must race in AHRMA events. AHRMA promotes and organizes ten to fourteen vintage motorcycling races annually, and sanctions another four—two of which are promoted by the AMA.

On the advice of AMA; in 1988 Iannucci retained Edward Bendelow, Esq., and his law firm Bendelow & Darling P.C. (a predecessor to defendant Bendelow Law Firm), to reorganize AHRMA. Bendelow provided le-

gal assistance to help AHRMA change from a privately held business into a not-for-profit association. Bendelow today is general counsel to AHRMA and allegedly controls AHRMA along with AHRMA Executive Director Jeff Smith. Upon Bendelow's advice, AHRMA was reorganized to create a Board of Trustees comprised of 12 trustees elected under an "at-large" system. Plaintiffs allege that this new system of governance permitted Bendelow and Smith effectively to take control of AHRMA.

### AHRMA's Efforts to Eliminate Team Obsolete

Iannucci was originally appointed as "Special Advisor" to the Board of Trustees for a five year term, but was forced out of this position at some unspecified time under pressure from AHRMA, Bendelow, and the AMA. When Iannucci was forced out, AHRMA agreed to accredit him as a founder of AHRMA for ten years, but breached this agreement by 1998. AHRMA also barred Iannucci from all appointed positions in AHRMA and terminated his membership.

AHRMA and AMA allegedly have agreed that all vintage motorcycle racing events held at AMA promoted locales (of which there are two—the previously mentioned Mid–Ohio and Sonomafest) will be organized and controlled by AHRMA, and that all AHRMA events are sanctioned by AMA. Plaintiffs allege that AHRMA, acting in collusion with AMA, has engaged in a fifteen year long campaign to destroy competition in the business and sport of vintage motorcycle racing by eliminating Team Obsolete as a major competitor and by reducing the number of events, entrants and available motorcycles that can be used in competition.

Plaintiffs point to a number of incidents that allegedly support this claim. The complaint devotes almost two hundred paragraphs to detailing these incidents, which can be divided into certain categories. For example, plaintiffs allege that AHRMA offi-cials have organized group boycotts of a number of Team Obsolete events by refusing to attend or publicize them, and in one case punishing riders who competed in a non-AHRMA sanctioned event promoted by Team Obsolete by subsequently assigning them poor post positions, a term which is undefined in the complaint but presumably refers either to how far from the inner ring of the track (as in horse racing) or how far back from the starting line (as in auto racing) a rider is placed before the race.

Other incidents alleged by plaintiffs include:

- publicizing false statements about the safety of one track where Team Obsolete staged an event;
- publicly disqualifying plaintiff Vesco;
- distributing anti-Iannucci stickers at one event;
- causing a test rider on an extremely rare motorcycle to lose his concentration and crash;
- falsely reporting that a fifteen time world champion would appear at an AHRMA event in order to draw attention away from his appearance the next day at a Team Obsolete event;
- improperly demanding that Team Obsolete pay AHRMA's legal fees under threat of revocation of Iannucci's membership and license after Team Obsolete and AHRMA settled a trademark dispute, and then falsely reporting that Iannucci paid the fees without protest;
- refusing to permit plaintiffs Roper and Green to post-enter (presumably referring to a late entry) contrary to AHRMA's own rules and its practice at that event;
- making false statements to the Patent and Trademark Office regarding a mark[2] ("SUPER MONO") that Team Obsolete had been using for some time;

---

**2.** It should be noted that plaintiffs also allege that AHRMA brought suit against Team Obsolete for use of a trademark BEARS (an acronym for the British European American Race Series) whose registration AHRMA had purportedly abandoned (the "BEARS litigation"). Plaintiffs allege that the "ugly litigation" that ensued led

Dayton Speedway to decline to renew an agreement with Team Obsolete for 1998. (*Id.,* ¶ 123) *See American Historic Racing Motorcycle Assoc., Ltd. v. Team Obsolete Promotions,* 33 F.Supp.2d 1000 (M.D.Fla.1998), *aff'd without op.,* 233 F.3d 577 (11th Cir.2000). In the BEARS litigation, the district court entered a permanent injunction

- deliberately confusing spectators and competitors by announcing, immediately after Team Obsolete announced its intention to revive the defunct "Trans–Atlantic Match Race" series, AHRMA's own intention to revive the series, thus scooping up sponsors, and also falsely stating that AMA had licensed the TAMR trademark to AHRMA; and

- announcing to promoters of "Sound of Thunder" events (which involve a specific subclass of vintage motorcycles) that AHRMA had a court order forbidding Team Obsolete from racing similar types of races, leading to the revocation of a planned Team Obsolete event in October 1998 by the promoter.[3]

### AHRMA Refuses to Renew Iannucci's Membership

In early 1999, AHRMA Executive Director Smith rejected Iannucci's application to renew his AHRMA membership. On February 4, 1999, the Board of Trustees affirmed this decision. Smith informed Iannucci of this and confirmed that AHRMA would not do business with Team Obsolete, and told Iannucci he had a right to be heard by the Board of Trustees.[4] As a result, all riders and motorcycles affiliated with Team Obsolete cannot compete in AHRMA events unless they disassociate themselves from Team Obsolete.

On February 11, 1999, AHRMA publicized its decision to reject Iannucci's application to renew his membership. The next day, Iannucci asked for details of the decision and requested a hearing before an impartial panel. In a letter dated March 26, 1999, Bendelow informed Iannucci that his membership was terminated for the "conduct" described in the BEARS trademark infringement litigation (in which the district court had just granted a permanent injunction against Team Obsolete after noting Team Obsolete's "shifty behavior" and possible bad faith, see n. 2, *supra*). Bendelow further informed Iannucci that AHRMA would no longer do business with Team Obsolete in part because of the BEARS litigation and in part simply because AHRMA was choosing not to do so. Bendelow also informed Iannucci that he could appear at the next board meeting in August 1999 in Phoenix, Arizona.

Iannucci hired counsel to speak on his behalf. When Iannucci's attorney discovered he was scheduled to be on trial at the same time as the Phoenix meeting, his attorney requested that the board meeting be rescheduled. AHRMA refused to reschedule the board meeting and also refused to permit a stenographer to attend, but did tape record the board meeting. Iannucci's attorney appeared before the board for five minutes, but objected solely to the after-the-fact nature of the hearing process.

The expulsion of Iannucci and Team Obsolete resulted in AHRMA rejecting race applications from riders who listed an affiliation with Team Obsolete. For example, in January 1999 eight riders applied to participate in vintage races at Daytona, but either were rejected or had their entries revoked because Team Obsolete sponsored them. When plaintiff Green retained an attorney (the same attorney who would represent Iannucci at the board meeting in August), AHRMA

---

against Team Obsolete regarding the use of the mark BEARS. *Id.*, at 1006, 1008. In its decision awarding the permanent injunction, the court noted that "Team Obsolete has a history of shifty behavior in its dealings with AHRMA.... Team Obsolete may have acted in bad faith when it used the BEARS mark." *Id.*, at 1006.

3. Plaintiffs also allege that in 1998 a flyer was mailed out to many AHRMA members on the day before the 1998 Mid–Ohio event. The flyer stated that (according to the Simon Wiesenthal Center for Holocaust Studies) the Holocaust could be attributed to the eviction of Adolf Hitler's mother, Klara, in 1921 by a banker named Abraham Rosenstein. The flyer claimed that Rosenstein's sole surviving descendant is a grandson raised by Italian brick masons in New York City who goes today by the name Robert Iannucci and is a "successful attorney and noted slumlord." (Am. Compl., ¶ 131.) Although the flyers were mailed from the same town in Ohio where the Mid–Ohio event occurred, plaintiffs do not allege that any of the defendants sent the flyers or caused the flyers to be sent. (*Id.*, ¶¶ 131–32.) Nor do plaintiffs raise any libel claims.

4. Iannucci contends that AHRMA bylaws do not permit the Executive Director to terminate a member and that only the board may do so, and then only after a hearing.

assessed Green legal fees for the time Bendelow spent reading the letter from Green's attorney. Although AHRMA initially barred these eight riders, the Daytona International Speedway intervened and persuaded AHRMA and AMA to permit Team Obsolete to continue racing for the season by creating a "Promoter's Option." Under this option, the riders applied to Daytona International Speedway and submitted application fees, and the speedway in turn forwarded the application and fees to AHRMA.

At the 1999 Sonomafest event, AHRMA again refused to process the applications of Team Obsolete riders, but inconsistently permitted Stuart Carter, who does not ride for Team Obsolete, to compete using a Team Obsolete bike. Unlike Daytona International Speedway, AMA (as the actual promoter for Sonomafest 1999) would not permit these applicants to race without AHRMA's approval. The same problem occurred at the 1999 Mid–Ohio event (which AMA also promotes) for a number of riders, and again at an AHRMA race in Park City, Utah, that plaintiff Vesco sought to enter. Finally, in 2002, plaintiff Roper applied and was accepted to race at an AHRMA event in Grattan, Michigan, but the acceptance was revoked by AHRMA when they discovered that his sponsor was Team Obsolete.

### Lost Sponsors for Team Obsolete

Plaintiffs allege that as a result of AHRMA's efforts a number of sponsors have either cancelled or curtailed their support. Although it is not entirely clear from the proposed amended complaint, it appears that sponsors will support teams both by directly contributing cash and also by providing parts for motorcycles used at races. In 1998, Megacycle Cams (with which Team Obsolete had worked since 1990) cancelled the financial part of their support following a personal request from one of AHRMA's trustees. Plaintiffs allege that at least three other sponsors have all either stopped sponsoring Team Obsolete or at least withdrawn cash support. Plaintiffs allege that all of these terminations were a direct result of AHRMA's efforts to disrupt Team Obsolete.

### AMA Appeals Process

Iannucci is a member of the AMA. On February 3, 1999, the AMA President stated that AMA viewed the AHRMA decision not to renew Iannucci's membership as a private dispute between Iannucci and AHRMA. At an AMA Board meeting in August 1999, the board again adopted this position of neutrality, although it continued to sanction all AHRMA events. An AMA resolution was adopted shortly thereafter, however, that provides "any current AMA member who had been denied the right to participate in an AMA sanctioned meet" may seek reconsideration of that decision via AMA's own appeal process.

Plaintiffs allege that this appeals process, however, has been rendered useless since AMA decided that the Team Obsolete ban merely excluded certain motorcycles based on their ownership and not the riders themselves, and that therefore AMA members were not being denied the right to participate in an AMA sanctioned meet.

### The Claims in the Amended Complaint

Plaintiffs assert claims against AHRMA under Sections 1 and 2 of the Sherman Act, California Unfair Competition law, and for breaches of contract, tortious interference with contract, and tortious interference with prospective business relationships. Plaintiffs also seek declaratory judgments regarding the ownership of the SUPER MONO trademark, the validity of the team owner assessment rule, and the validity of AHRMA's legal fees rule. As to AMA and the Bendelow law firm, plaintiffs assert claims solely under Section 1 of the Sherman Act and California Unfair Competition law. The claims against Edward Bendelow individually were already dismissed for lack of personal jurisdiction by order of this Court dated March 15, 2002.

AMA and Bendelow now seek judgment on the pleadings (or dismissal of) all claims against them. AHRMA addresses certain claims, and seeks judgment on the pleadings for the remaining claims for lack of diversity jurisdiction, a defect corrected by the amended complaint.

## DISCUSSION

### I. Motion to Amend the Complaint

Plaintiffs seek leave to amend the complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure. As Rule 15(a) states, "leave shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). However, "[o]ne appropriate basis for denying leave to amend is that the proposed amendment is futile. An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Lucente v. International Business Machines Corp.*, 310 F.3d 243, 258 (2d Cir.2002) (citations omitted). Therefore, except to the extent that the allegations in the proposed amended complaint fail to state a claim, leave will be granted. Since the standards of review are the same under 12(b)(6) and 12(c), *see S.O. Textiles Co., Inc. v. A & E Products Group*, 18 F.Supp.2d 232, 238 (E.D.N.Y.1998) (Glasser, J.), defendants' motions will be measured against the claims in the amended complaint taking the allegations therein as true. *See Dougherty*, 282 F.3d at 87.

### II. Claims Dismissed By Amendment of the Complaint

In the proposed amended complaint, plaintiffs have abandoned their RICO claims against all defendants and apparently have agreed with defendants to dismiss those claims with prejudice. (*See* Pl. Opp. Mem. at 5.)

 Plaintiffs also seek to dismiss all claims against the individual AHRMA defendants without prejudice because they are not subject to personal jurisdiction in New York. Under Fed.R.Civ.P. 41(a), the presumption is that a motion to dismiss claims without prejudice should be granted absent "plain legal prejudice" to the defendant, a term that does not encompass merely the risk of a second lawsuit. *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 217, 67 S.Ct. 752, 91 L.Ed. 849 (1947); *see Guzman v. Hazemag*

*U.S.A., Inc.*, 145 F.R.D. 308, 309 (E.D.N.Y. 1993) (Glasser, J.) (stating that presumption is that motion to dismiss without prejudice should be granted); *Gap, Inc. v. Stone Int'l Trading, Inc.*, 169 F.R.D. 584, 588 (S.D.N.Y. 1997) (same). "Factors relevant to the consideration of a motion to dismiss without prejudice include the plaintiff's diligence in bringing the motion; any 'undue vexatiousness' on plaintiff's part; the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; the duplicative expense of relitigation; and the adequacy of plaintiff's explanation for the need to dismiss." *Zagano v. Fordham University*, 900 F.2d 12, 14 (2d Cir. 1990).

 The AHRMA defendants argue that, after this Court's March 15, 2002 order dismissing the claims against Edward Bendelow for lack of personal jurisdiction, they sent numerous letters to counsel for plaintiffs demanding that they abandon the claims against the individual AHRMA defendants. (*See* Zucker Aff., Exs. H and I.) Only after the AHRMA defendants brought these motions did plaintiffs seek leave to dismiss the claims against the individual AHRMA defendants. The individual AHRMA defendants argue that these claims should be dismissed with prejudice since no viable antitrust claims were ever pled, nor were any other claims cognizable against them.[5]

However, the *Zagano* factors do not weigh against dismissing the claims without prejudice. Although plaintiffs did not seek to dismiss these claims until after this Court's personal jurisdiction decision and after the AHRMA defendants filed their first dispositive motions, the decision to drop the claims is relatively early in the course of litigation and certainly far from any trial date. Plaintiffs' explanation that the individual AHRMA defendants should be dismissed for lack of personal jurisdiction (a point not contested by the individual AHRMA defendants and indeed raised as an affirmative defense in

---

5. The AHRMA defendants also note that plaintiffs selectively sued only certain members of the board of trustees, but not others, based on what the AHRMA defendants claim are strategic reasons. (AHRMA Def. Reply Mem. at 7–8.) The

AHRMA defendants do not claim, however, that these other board members are indispensable parties to this litigation, nor do they address why plaintiffs should be required to sue all members of AHRMA's board of trustees.

their Answer) is more than adequate to explain dismissal without prejudice. Moreover, since none of the individual AHRMA defendants filed counterclaims in their answer to the original complaint, a dismissal of the claims against them would not lead to claim splitting or other problems in conducting litigation. Finally, if the claims against the individual defendants are frivolous, vexatious, or lack merit, that issue can be adequately addressed either by dispositive motions or the equivalent of Rule 11 in the proper court if plaintiffs do refile these claims elsewhere.

Accordingly, plaintiffs should be permitted to dismiss without prejudice the claims against the individual AHRMA defendants. On the parties consent, the RICO claims are dismissed with prejudice. *See* Fed.R.Civ.P. 41(a)(1).

## III. Antitrust Claims

### A. Applicable Statutes of Limitations

The original complaint was filed on March 14, 2001. Since federal antitrust claims have a four-year statute of limitations, *see* 15 U.S.C. § 15b, this means that only those allegations that occurred after March 14, 1997, can give rise to an antitrust cause of action. A cause of action accrues "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). "In the context of a continuing conspiracy to violate the antitrust laws ... this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* Although some of the acts are alleged to have occurred prior to March 14, 1997, that fact alone would not preclude antitrust liability since many of the acts occurred after that date, and therefore a cause of action accrued on each of those occasions.

### B. Sufficiency of the Antitrust Conspiracy Allegations

■ All defendants allege that the Complaint, even if amended, fails to allege ade-quately the existence of an antitrust conspiracy. "The naked statement that the defendant 'conspired' with other entities is not sufficient without some factual allegation as to what constituted the conspiracy." *See Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,* 142 F.Supp.2d 296, 301 (E.D.N.Y. 2001), *aff'd,* 35 Fed.Appx. 29 (2d Cir.2002) (summary order). "To adequately set forth a conspiracy, a complaint must provide facts that reasonably tend [ ] to prove that the defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Mover's & Warehousemen's Ass'n of Greater New York, Inc. v. Long Island Moving & Storage Ass'n, Inc.,* 1999 WL 1243054, at *3 (E.D.N.Y. Dec. 16, 1999) (quotation marks omitted). "In order to adequately allege an antitrust conspiracy, the pleader must 'provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken place.'" *Orthopedics Studio, Inc. v. Health Ins. Plan of Greater New York,* 1996 WL 84503, at *3 (E.D.N.Y. Feb. 9, 1996) (Glasser, J.) (*quoting Estate Const. Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 221 (4th Cir.1994)).

In this case, the only allegation of conspiracy is the allegation that AMA and AHRMA have an exclusive agreement that all vintage motorcycle racing at the two AMA promoted locales are organized and controlled by AHRMA, and that all AHRMA events will be sanctioned by the AMA. There are no allegations of the time or place of any conspiratorial acts, and perhaps most importantly, there are no facts alleged that demonstrate that AMA had a conscious commitment to the purported scheme to oust Team Obsolete and reduce competition in the market for vintage motorcycle races. Although AHRMA may have sought to oust Team Obsolete wrongly or improperly, those actions independent of any antitrust conspiracy do not constitute a violation of Section 1 of the Sherman Act.

### C. Antitrust Injury

#### 1. Per Se Analysis of Section 1 Claims

■ Even if the conspiracy allegations were sufficiently pleaded, plaintiffs also face

a significant hurdle to allege the existence of antitrust injury. Plaintiffs must "demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 542 (2d Cir.1993). In order for conduct to be illegal per se, it must be "so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are 'conclusively presumed illegal without further examination.'" *Id.* (*quoting Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 8, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)). "[T]he per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor ...." *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (holding that professional association's blanket requirement that members refuse to forward x-ray films with claim forms to insurance companies violates rule of reason). Per se violations include: horizontal and vertical price-fixing, division of a market into territories, certain tying arrangements, and some group boycotts involving concerted refusals to deal with a competitor. *Capital Imaging,* 996 F.2d at 542–43.

Plaintiffs argue that defendants' anticompetitive conduct includes both division of the market and group boycotts, as well as "predatory use of intellectual property rights." (Pl. Mem. at 12.) In support of their horizontal restraints argument, plaintiffs contend that AHRMA and AMA have divided the market between them since they are sponsors and sanctioning bodies who have agreed (1) that all AHRMA events will be sanctioned by the AMA. (2) that both AMA promoted events will be organized by AHRMA, and (3) that AMA sanctioned events will use AHRMA as the promoter for vintage motorcycling. These allegations, however, do not suffice to show a division of market. These allegations simply mean that AMA is acting as the equivalent of an upstream provider of events for motorcycling, generally by sanctioning motorcycle events and promoting two specifically. AHRMA is acting essentially as AMA's exclusive agent in organizing or run-

ning the vintage motorcycle aspects of these events. The alleged agreement requires AMA to use AHRMA for AMA-sanctioned vintage motorcycle racing, but it does not otherwise restrict AHRMA from promoting events without AMA's involvement. The alleged agreement between AMA and AHRMA is akin to an exclusive distribution agreement (all AMA-sponsored or promoted vintage motorcycling will be handled by AHRMA), but such agreements are not usually subject to per se analysis unless they involve price fixing. *See generally NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 136, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (noting prior holdings that vertical agreements are not per se illegal unless it includes some agreement to fix prices); *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 245 (2d Cir.1997) (noting that exclusive distribution agreements presumptively legal unless marketwide restraint on competition results). As for the allegations of a group boycott, the per se rule applies solely "in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX,* 525 U.S. at 134, 119 S.Ct. 493. Since the AMA and AHRMA are not direct competitors, the per se rule is inapplicable.

### 2. Rule of Reason Analysis of Section 1 Claims

■ "Most cases fall outside these narrow, carefully demarcated categories held to be illegal per se. In the general run of cases a plaintiff must prove an antitrust injury under the rule of reason." *Capital Imaging,* 996 F.2d at 543. "Under this test plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Id.* "The antitrust laws ... were enacted for the protection of competition, not competitors." *George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (internal citations and quotations omitted).

Plaintiffs argue that they have alleged facts showing that AHRMA and AMA's boycott of Team Obsolete has "reduced competi-

tion and output in the business and sport of vintage motorcycle racing since it has resulted in less races for the riders and consuming public." (Am. Compl. ¶ 227; *see* Pl. Mem. at 24.) However, no races were cancelled as a result of AMA's agreement with AHRMA, nor do plaintiffs allege that Team Obsolete has been prevented from staging its own races (albeit without AMA's sanction).[6]

Similarly the exclusion of riders cannot be fairly read to allege exclusion from the market, since these allegations merely involved riders racing as members of Team Obsolete and not as individuals themselves. (*See, e.g.,* Am. Compl. ¶ 163, 171.)[7] Therefore the anticompetitive acts alleged relate to the exclusion of Team Obsolete as a racing entity from competing in AHRMA events.

In this respect, these allegations are similar to those dismissed in *Seattle Totems Hockey Club, Inc. v. National Hockey League,* 783 F.2d 1347 (9th Cir.1986). In that case, the National Hockey League ("NHL") conditionally awarded a franchise to the Seattle Totems (a minor league hockey team), but then revoked the offer when certain conditions were not met. *Id.,* at 1349. The Seattle Totems argued that the revocation of the invitation to join the NHL was part of a general anti-competitive scheme by the NHL to destroy a competitor league (the short-lived World Hockey Association), but the Ninth Circuit held that the denial of a sports franchise was not an injury to competition since the Seattle Totems were not actually seeking to compete with the NHL, but rather to join the league itself. *Id.,* at 1350. Similarly, in the present suit there can be no injury to actual competition (as opposed to Team Obsolete itself) by the exclusion of one team from competing in AHRMA events or from being sanctioned by the AHRMA. Since the antitrust injury requirement ensures that the Sherman Act is invoked to protect only "competition, not competitors,"

these allegations are insufficient to state a claim.

Plaintiffs point to the antitrust claims in *Volvo North America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55 (2d Cir.1988), as analogous to the claims asserted in their proposed amended complaint. In *Volvo,* two tennis federations that directly competed with each other in sponsoring tennis tournaments agreed in essence to impose ceilings on player compensation and to contractually restrict players in their events from entering other events during a majority of the weekends of the year. *Id.,* at 60–61. The Second Circuit found that these allegations sufficed to constitute antitrust injury to other tennis tournament sponsors who sought to enter the market and compete with the two main tennis federations. *Id.,* at 69. However, as these facts show, the agreement in *Volvo* went directly to contractual restrictions on the ability of tennis players to enter the tournaments of other sponsors. Plaintiffs do not allege that AHRMA or AMA similarly restrict riders from entering events organized by Team Obsolete, nor do plaintiffs allege that AHRMA and AMA have monopolized every event date or venue.

At oral argument, counsel for plaintiffs argued further that AHRMA and AMA's actions were stifling competition in that they prevented Team Obsolete from organizing and sponsoring its own events, essentially undermining Team Obsolete as a nascent competitor. However, this argument cannot be reconciled with the facts alleged, since the proposed amended complaint alleges that Team Obsolete sought AHRMA's and AMA's sanction for its events. This case is thus comparable to *Seattle Totems,* and the same result is warranted. Absent a lack of injury to competition itself, Team Obsolete does not have standing to allege antitrust injury and therefore Counts I and II alleging violations

---

**6.** Indeed, the Amended Complaint notes that Team Obsolete has been able to stage events despite the alleged conspiracy. Although plaintiffs do note that racers are not covered by the ARMOUR insurance policy without AMA's sanction, plaintiffs do not allege anywhere that insurance is otherwise impossible to obtain.

**7.** Since the alleged injury to the individual rider plaintiffs is derivative of Team Obsolete's, they would lack standing for that reason as well. *See G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766 (2d Cir.1995).

of Section 1 of the Sherman Act should be dismissed.

### 3. Antitrust Injury Is Also Required for Section 2 of the Sherman Act

Plaintiffs' third claim for relief alleges that AHRMA is violating Section 2 of the Sherman Act, which prohibits illegal monopolization. *See* 15 U.S.C. § 2. Like Section 1, Section 2 also requires that a plaintiff suffer antitrust injury. *George Haug*, 148 F.3d at 139 ("A private plaintiff seeking to state a claim for a violation of sections 1 *or 2* of the Sherman Act must allege that it has suffered 'antitrust injury.'") (emphasis supplied). Since plaintiffs have failed to allege antitrust injury, Count III is also dismissed.

## IV. California's Unfair Competition Law

In their twelfth count of the proposed amended complaint, plaintiffs claim that the 1999 exclusion of riders, the 1998 punishment of riders who competed at Laguna Seca, and the 1997 Sonomafest acts [8] were unfair and unlawful under § 17046 of the California Business and Professional Code (and also in violation of § 17200 of the same Code) and that AHRMA and AMA's agreement violates § 17048 of the same Code.

Section 17046 provides that "[i]t is unlawful for any person to use any threat, intimidation, or boycott, to effectuate any violation of this chapter [relating to unfair trade practices]." Cal. Bus. & Prof.Code § 17046. Sections 17048 provides "[i]t is unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker, retailer, or other vendor, or any agent of any such person, jointly to participate or collude with any other such person in the violation of this chapter." Cal. Bus. & Prof.Code § 17048. Furthermore, Section 17200 defines in relevant part "unfair competition" to "mean and include any unlawful, unfair or fraudulent business act or practice . . . ." Cal. Bus. & Prof. Code § 17200.

California interprets the "unfair" prong of its laws broadly. *See Searle v. Wyndham International, Inc.,* 102 Cal.App.4th 1327,

1333, 126 Cal.Rptr.2d 231, 235 (Cal.App. 2002). Outside the context of actions between direct competitors, however, the definition of "unfair practices" includes acts which are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Searle, supra,* 102 Cal.App.4th at 1334, 126 Cal.Rptr.2d at 236; *cf. FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) (holding that an unfair practice under Section 5 of the Federal Trade Commission Act includes one which is "immoral, unethical, oppressive, unscrupulous . . . [or] causes substantial injury to consumers (or competitors or businessmen)"). When a direct competitor alleges an unfair practice, however, the California Supreme Court has cautioned that "unfair" is limited to conduct that at least violates the "policy or spirit of an antitrust law because its effects are comparable to or the same as a violation of that law, or otherwise significantly threatens or harms competition." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 187, 973 P.2d 527, 544, 83 Cal.Rptr.2d 548, 565 (1999). Defendants raise a number of arguments to dismiss this count; each is dealt with below.

### A. Statute of Limitations

Defendants point to the statute of limitations for California unfair competition claims, which is four years. Cal Bus. & Prof.Code § 17208. The earliest action alleged to have violated California's law occurred in August 1997, and therefore the claim would need to have been brought in August 2001. Since the claim was originally filed on March 14, 2001, the statute of limitations is easily satisfied.

### B. Existence of Injury in California

■ Given California's presumption against extraterritorial application of its unfair competition laws, *see Norwest Mortgage, Inc. v. Superior Court,* 72 Cal.App.4th 214, 222, 85 Cal.Rptr.2d 18, 23 (Cal.App.1999), the

---

**8.** At Sonomafest in 1997, AHRMA and AMA allegedly excluded Team Obsolete from the team display and instructed the track announcer to

minimize any mention of Team Obsolete. (*See* Am. Compl. ¶¶ 104–06.)

parties agreed at oral argument that these claims only apply to injuries that occurred in California. AMA argues that because neither Team Obsolete nor the defendants are California entities, and because neither the gist of the action nor the damages took place in California, the claims should be dismissed. Although it is possible that some of the harm reverberated beyond the territorial boundaries of California, some injury (to the individual riders unable to race) occurred in California. Therefore, at least with respect to the individual riders, the amended complaint adequately alleges injury under California law.

■ However, as for Team Obsolete and Iannucci himself, their own prior admissions settles the issue. In opposing Edward Bendelow's motion to dismiss for lack of personal jurisdiction, Iannucci submitted an affidavit to support Team Obsolete's argument that New York had some nexus with the injuries that AHRMA and AMA (with Bendelow's assistance) were alleged to have caused. In that sworn affidavit, Iannucci stated that "the ultimate commercial impact" on Team Obsolete from the refusal of AHRMA or AMA to sanction Team Obsolete events "has been in New York." (*See* Zucker Reply Aff., Ex. C (Affidavit of Robert Iannucci sworn to August 9, 2001), ¶ 13.) Therefore, the California unfair practices claim fails as to Team Obsolete since Iannucci admitted that their injury occurred elsewhere. Additionally, since Iannucci himself suffered no injury in California, the claim is dismissed with regard to Iannucci as well.

### C. Standing of the Individual Plaintiffs

AHRMA argues in passing that the individual plaintiffs should not have standing to assert injury since the actions were solely taken against Team Obsolete and the individual riders were free to race under another team or independently. While this argument may be true in the federal antitrust context, *see G.K.A. Beverage,* 55 F.3d at 766 (derivative injuries are insufficient for Sherman Act claims), AHRMA does not point to any comparable restriction in California state law. Given that the definition of unfair practices should be read broadly under California law,

at the pleading stage it cannot be said that the individual plaintiffs' claims are insufficient to state a claim, but defendants may revisit the argument at the appropriate time.

### D. Plaintiffs' Agreement to Withdraw the California Claims

AHRMA also argues that plaintiffs previously represented that they would withdraw the California claim. (*See* AHRMA Reply Mem. at 13; Zucker Reply Aff. ¶¶ 3–5.) Specifically, as a courtesy, AHRMA extended plaintiff's time to oppose the motion on June 3, 2002. (Zucker Reply Aff., Ex. A.) After that, plaintiffs' counsel subsequently represented that they would withdraw the RICO and California claims and were considering withdrawing the claims against the individual AHRMA defendants, and AHRMA therefore consented to several requests to extend the due date. (Zucker Reply Aff. ¶ 4.) On September 3, 2002, plaintiffs' counsel informed AHRMA's counsel by phone that the California claims would remain, and AHRMA's counsel protested by letter on same date. (Zucker Reply Aff. ¶ 5 and Ex. B.)

It is unclear whether AHRMA actually seeks dismissal of the California claim on this basis. Since this argument was not raised until reply, plaintiffs did not confirm or deny AHRMA's charge that an agreement was reached to dismiss the California claims.

■ Assuming that AHRMA does seek dismissal on this basis, the mere oral representation to withdraw a claim is insufficient to bind that party unless made by stipulation in open court or in a writing subscribed by that party (or their counsel). Normally, stipulations or agreements between parties or their attorneys in New York must be made in writing (and subscribed by the party sought to be bound or his or her attorney) or else in open court. N.Y. C.P.L.R. 2104. "[T]he federal rule regarding oral stipulations does not differ significantly from the New York rule." *Monaghan v. SZS 33 Assocs. L.P.,* 73 F.3d 1276, 1283 n. 3 (2d Cir.1996). California law is similar, holding that an attorney can only bind his client by written agreement, *see Beckett v. City of Paris Dry Goods,* 26 Cal. App.2d 295, 79 P.2d 178 (Cal.App.1938) and *Harrold v. Harrold,* 100 Cal.App.2d 601, 224

P.2d 66 (Cal.App.1950), or by stipulation in open court, *Lyons v. Lyons,* 190 Cal.App.2d 788, 12 Cal.Rptr. 349 (1961). Accordingly, unless there is a written stipulation signed by plaintiffs' counsel, this alleged representation made by plaintiffs' counsel does not suffice to dismiss the California claim.

### V. Claims Against the Bendelow Law Firm

The only claims in the amended complaint against defendant Bendelow Law Firm (since the amended complaint does not seek to reallege claims against the other Bendelow defendants) are the Sherman Act Section 1 claims and the California claim. For the reasons set out above, the Sherman Act claims are dismissed. As for the California claims, plaintiffs nowhere allege that Bendelow Law Firm took any action in or had any contact with California. Accordingly, the California claim is also dismissed as to Bendelow Law Firm.

### VI. Exhaustion of Administrative Remedies

In the amended complaint, plaintiffs Vesco, McCroskey, Kain, and Green (Count V) and Redman (Count VI) allege that AHRMA breached its contractual duties toward them by excluding them from races despite their active membership in AHRMA. (*See* Am. Compl. ¶¶ 251–277.) AHRMA argues that these plaintiffs failed to appeal their eligibility determinations, and therefore should be precluded from asserting these claims. Plaintiffs admit that they did not use the AHRMA appeals process, but argue that the rejection of the race applications was not an appealable decision and that also it would have been futile to do so.

Section 6.4.1 of the AHRMA Rule Book [9] provides that entrants "have the right to appeal decisions of the Rules and Eligibility Committee and decisions on protest." The parties agree that since the riders were not excluded from racing by the Rules and Eligi-

bility Committee, an appeal could only have been taken from a "decision on protest." The Rule Book notes that "protests are generally based on entry conduct, claimed motorcycle illegality or ineligibility; however, they may be for other reasons." AHRMA Rule Book § 6.3.

Referring to this definition of "protest", AHRMA notes that two of the plaintiffs actually did appeal in two other instances, and argues that therefore these plaintiffs should be bound to acknowledge that they were required to appeal from these decisions now protested. For example, the original complaint alleged that Redman filed an appeal after a 1995 incident in which he received a letter of reprimand for purportedly riding a different motorcycle with incorrect and nonconforming license plates and stickers at an event at Daytona.[10] (Orig.Compl. ¶¶ 45–56.) Similarly, Iannucci appealed the termination of his membership. (Am.Compl. ¶¶ 133–142.)

However, both of those appeals were from actions either explicitly described in the definition of protest—in Redman's case, "motorcycle illegality or ineligibility,"—or that specifically mentioned the right to appeal—e.g., when Smith informed Iannucci that AHRMA had rejected Iannucci's application to renew his membership. Looking only at the pleadings it cannot be said that those two instances are equivalent to the decision not to allow certain riders to race in AHRMA events based on their team affiliation. Therefore it cannot be determined at this stage whether those decisions were appealable. At the very least, plaintiffs' allegations are sufficient to state a claim, and AHRMA can revisit its exhaustion requirement after discovery clarifies whether these denials were appealable under AHRMA's own rules. Similarly, if the denials of the race entries were appealable, the question of futility can be addressed at that time.

### VII. Other State Law Claims

AHRMA argues that the other state law claims (primarily breach of contract and

---

9. Since plaintiffs' pleadings make direct reference to violations of the AHRMA's internal rules, those rules are integral to plaintiffs' claims and they can be properly considered on a motion to dismiss. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002).

10. These 1995 allegations about Redman are not in the proposed amended complaint.

tortious interference claims) should be dismissed for lack of diversity jurisdiction between the parties. However, since the proposed amended complaint has eliminated all non-diverse parties, this court may exercise diversity jurisdiction over the state law claims even if all federal claims are dismissed.[11] *See Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 833 n. 7, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) (noting that dispensable nondiverse party may be dismissed to preserve diversity jurisdiction); *see generally* 8 Moore's Federal Practice § 41.21[4] (noting that same result is achieved if parties are dropped under either Rules 21 or 41 of the Federal Rules of Civil Procedure). Accordingly, since the complaint alleges that the controversy exceeds $75,000 and since there is complete diversity between the parties, this Court has jurisdiction over the state law claims.

## VIII. Rule 11 Motion

Under Rule 11, an attorney or an unrepresented party by submitting a pleading, written motion or other paper to the court, certifies that:

(1) it is not being presented for any improper purpose, such to harass or cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Civ.P. 11(b). The 1993 amendments to Rule 11 prescribe specific procedural requirements for the imposition of sanctions.

A party seeking sanctions under Rule 11 must serve the motion on its adversary but not file or present it to the court until at least 21 days after service. *See* Fed.R.Civ.P. 11(c)(1)(A). If the party against whom sanctions are sought corrects the alleged violation during this "safe harbor" period by withdrawing the offending document before the motion is filed, there is no Rule 11 liability. *See id.* Prior to the 1993 amendments, a party may have been reluctant to abandon a questionable contention lest it be viewed as evidence of a Rule 11 violation. The new safe harbor provision was intended to insulate those who withdraw a sanctionable paper and reduce the number of Rule 11 motions. Fed.R.Civ.P. 11, Advisory Committee's Note.

AHRMA moves for sanctions pursuant to Rule 11 because plaintiffs purportedly made certain jurisdictional statements, claims and legal contentions without any basis in law, certain allegations without any factual support, and improperly sued the individual AHRMA trustees. The jurisdictional statement in question was the allegation of diversity jurisdiction in the original complaint where none existed due to the presence of both plaintiffs and defendants domiciled in California as well as Kansas. AHRMA argues that the complaint alleges plaintiffs personal jurisdiction over the individual AHRMA defendants without any basis, and also argues that the claims against the individual AHRMA defendants lacked merit. AHRMA also claims that the Sherman Act claims, the RICO claims, and the California claims, as well as the individual plaintiffs' claims for breach of contract, lack merit for the same reasons as articulated in its motion for judgment on the pleadings.

In response to the motion, plaintiffs have sought leave to amend the complaint to drop the RICO claim and all the claims against the individual AHRMA defendants. Accordingly, those claims are effectively withdrawn. Moreover, by seeking to dismiss the individual AHRMA defendants, the diversity allegations are no longer defective. Plaintiffs have

---

**11.** It should be noted that AHRMA does not seek to dismiss Team Obsolete's Lanham Act claims

relating to the SUPER MONO mark. This claim would also provide federal question jurisdiction.

therefore effectively taken shelter in Rule 11's safe harbor provision for these claims.[12]

■ Thus, the only remaining elements of the Rule 11 motion are AHRMA's demands based on the substantive failings of the antitrust and California claims and the breach of contract claims. The mere fact that the plaintiffs fail to state a claim, however, does not mean that Rule 11 sanctions should be imposed. "Otherwise Rule 11 sanctions would be imposed whenever a complaint was dismissed, thereby transforming it into a fee shifting statute under which the loser pays." *Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin. Serv., Inc.*, 9 F.3d 1263, 1270 (7th Cir.1993). Here, for example, there is very little dispute that the vast majority of the factual allegations satisfy the Rule 11 requirement that they have some evidentiary support. Moreover, some of the arguments advanced by defendants to dismiss these claims, such as the statute of limitations, do not warrant their dismissal.

As to the deficiencies in the Sherman Act pleading, plaintiffs' counsel did defend its claim by relying upon circuit precedent that found an exclusionary agreement by sporting event promoters to have caused harm to competition. *See Volvo, supra.* Although that case is distinguishable from the facts pleaded here, it cannot be said that plaintiffs' claims were wholly unwarranted or frivolous under existing antitrust law. As to the California claims, those claims are not wholly frivolous given that the claims are based on actual races in California from which the individual plaintiffs were excluded.

The court is aware that, based on the pleadings and the reported decision in the BEARS trademark litigation as well as the representations of counsel at oral argument, this suit stems from a long running dispute between AHRMA (and AMA to a lesser extent) on the one hand and its former member Iannucci and Team Obsolete on the other hand. The intra-organizational aspects of this dispute, however, do not make the complaint one presented for an improper purpose

such as harassment. All too often litigation is based upon the deterioration of a relationship between business partners. Instead, plaintiffs present grievances based on a series of different acts that were allegedly taken to drive Team Obsolete out of business (and therefore out of competition), and assert a number of claims of which not all are dismissed. The Second Circuit has cautioned that there is "a considerable difference for Rule 11 purposes between an entirely frivolous complaint and a complaint including both 'doubtful' counts and counts of 'reasonable merit.'" *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 177 (2d Cir.1999). Merely dismissing some of the claims under Rule 12 does not warrant sanctioning parties under Rule 11 for filing the complaint in the first place, especially where plaintiffs have moved to withdraw most of the less tenable claims.

It must be noted that AHRMA waited for over a year to object to the filing of the complaint in the first instance. Although Rule 11 motions can be filed at any time, the Court is aware of the Advisory Committee's Notes to that Rule, which state: "Ordinarily the motion should be served *promptly* after the inappropriate paper is filed, and if delayed too long, may be viewed as untimely." Fed.R.Civ.P. 11, Adv. Comm. Note 1993 Amend. (emphasis added); *see also* 5A Wright, Miller & Kane, Federal Practice & Procedure § 1337 ("Rule 11 motions should be made promptly after the challenged conduct takes place.") If the claims on their face were patently frivolous or without any basis in existing law (as opposed to containing factual allegations that only subsequent discovery would reveal lacks support), AHRMA could have moved far sooner. *See Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 98–100 (3d Cir.1988) (explaining policy reasons for requiring "prompt action by a litigant whenever a Rule 11 violation appears").

Accordingly, AHRMA's motion for sanctions pursuant to Rule 11 is denied.

---

12. Plaintiffs did not withdraw these claims until far more than 21 days after service of the Rule 11 motion, but this is due in part to the fact that the parties had negotiated among themselves a long-er time for responses (as is proper under this Court's Individual Practices), and the claims thus were withdrawn before the motions were to be filed.

## CONCLUSION

On consent of the parties, the RICO claims are dismissed with prejudice. AMA's motion for judgment on the pleadings is granted except for the individual riders' claims under the California unfair competition statutes. AHRMA's motion for judgment on the pleadings is also granted with regard to the Sherman Act claims and to Team Obsolete and Iannucci's California unfair competition claims, but otherwise is denied. On plaintiff's motion for leave to amend the complaint, the claims against the individual AHRMA defendants are dismissed without prejudice. Bendelow Law Firm's motion to dismiss is granted. AHRMA's motion for Rule 11 sanctions is denied. Plaintiffs' motion seeking leave to amend the complaint is granted except to the extent noted above, and also upon correction of the caption to properly state the remaining parties.

Plaintiffs are directed to file and serve an amended complaint conforming with this memorandum and order within twenty days of this order.

SO ORDERED.