D Scott **CARRUTHERS**, Springhawk LLC, Summerhawk LLC,
Plaintiffs,

v.

David **FLAUM**, Flaum Management Company, Inc., 3D Associates LLC, A.P. Equity, Inc., Ancestral Reclamation LLC, Alan H. Young, Individually and d/b/a Lindenbaum & Young, Lindenbaum & Young, Charles Petri, Gene Barbanti, Individually and d/b/a the Barbanti Group Real Estate and James Simermeyer, Defendants.

No. 03 Civ. 7768.

United States District Court,
S.D. New York.

Sept. 6, 2006.

John Gilbert Horn, Karen R. Kaczmarski, Harter, Secrest & Emery, LLP, Buffalo, NY, for Plaintiffs.

Joshua E. Kimmerling, Cuddy & Feder LLP, White Plains, NY, Karl Essler, Fix Spindelman, Brovitz & Goldman, P.C., Fairport, NY, Gerald Orseck, Orseck Law Offices, Liberty, NY, Marvin Newberg, Attorney–At–Law, Monticello, NY, Robert Jay Semaya, Moses & Singer LLP, Robert David Werth, Robert D. Werth, P.A., New York, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTIONS FOR SANCTIONS

MCMAHON, District Judge.

### Introduction

The parties to this case were co-venturers in an ill-starred attempt to open a

number of casinos, resorts, and high-stakes bingo parlors on the "tribal land" of the Unkechaug Indian Nation in Sullivan and Suffolk Counties. Their endeavor fell through in large part because the Unkechaug lack federal recognition as a tribe and thus cannot legally operate a casino in New York State.

Nonetheless, the parties set up limited-liability companies for their venture, entered into operating agreements, and sought to acquire land in Sullivan County on which to build their future gambling empire. At least one parcel of land owned by defendant Charles Petri—a small plot off Exit 106 of Route 17—was transferred to the Unkechaug, in exchange for $550,000, which was supplied by plaintiff Carruthers. However, the land was subject to a multi-million dollar mortgage, which was ultimately foreclosed on, causing the loss of the entire investment. A second Parcel, located off Exit 107, was supposed to be transferred to the Unkechaug but never was.

Plaintiffs now assert that Petri and his associates breached several provisions of the contract for the 106 and 107 Parcels, and made various fraudulent misrepresentations during negotiations in order to induce plaintiffs to agree to the deal in the first place. Plaintiffs also bring claims against Alan Young, attorney to the Petri defendants, for breach of fiduciary duty as an escrow agent, and against David Flaum, a real estate developer who allegedly was the secret backer of the Petri defendants' activities. Finally, plaintiffs claim that James Simermeyer, their own attorney and business partner, committed malpractice in failing to secure the parcels.

Before this Court are four motions for summary judgment: one each from defendants Flaum, Young, Petri, and Simermeyer. Flaum and Simermeyer also move for sanctions pursuant to Fed.R.Civ.P. 11. For the reasons set out below, defendants' motions for summary judgment are granted. Flaum's and Simermeyer's motions for sanctions, however, are denied.

### Facts [1]

The instant case arises out of the efforts of the Unkechaug Indian Nation ("the Nation") and its chief, Harry Wallace (formerly a named defendant in this case), to establish casino gaming and high stakes bingo on their "ancestral lands" in Sullivan and Suffolk counties. In the course of those efforts, the Nation and its business partners allegedly entered into a series of deals for the acquisition of land as the site of the Nation's future casino. These deals went bad, and the parties now blame one another for the collapse.

Of course, gaming is illegal in New York state, and has been since 1771 and the colonial governorship of William Tryon. *See Saratoga County Chamber of Commerce Inc. v. Pataki*, 100 N.Y.2d 801, 825–28, 766 N.Y.S.2d 654, 798 N.E.2d 1047 (2003) (Smith, J., concurring in part) (recounting the history of New York's anti-gaming laws). However, New York's long-standing anti-gaming policy was upended by the 1997 Supreme Court decision in *California v. Cabazon Band of Mission Indians*, which held that state regulatory powers over gambling did not extend to the regulation of gaming on Indian land contained within a state's territory. 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In the wake of that opinion, Congress passed the Indian Gaming Regulato-

---

**1.** The characters and events of this melodrama may be familiar to the reader from this Court's previous opinions: *Carruthers v. Flaum*, 365 F.Supp.2d 448 (S.D.N.Y.2005)

(hereinafter, *"Carruthers I"*) and *Carruthers v. Flaum*, 388 F.Supp.2d 360 (S.D.N.Y.2005) (hereinafter, *"Carruthers II"*).

ry Act of 1988, Pub.L. 100–497, 102 Stat. 2467 (1988) (codified at 25 U.S.C. §§ 2701–2721) (*hereinafter*, the "IGRA"). The IGRA formally permitted gaming operations on Indian land, while giving state authorities some limited power to approve and regulate such activities.

With the passage of the IGRA, numerous Indian nations across the country, including the Unkechaugs, saw an opportunity to cash in. However, unlike many of their sister nations, the Unkechaugs lacked federal recognition as a tribe—a requirement for a nation to obtain the benefit of the IGRA's preemption of local anti-gaming ordinances.

The Nation's quest for casino gaming apparently began with a conference on economic opportunities for the Unkechaug Nation held in upstate New York in 2001. Defendant James Simermeyer, himself an Indian but not an Unkechaug (his tribal affiliation is unclear) as well as a friend, colleague and one-time law partner of Wallace, attended the conference. Affidavit of James Simermeyer in Support of Motion for Summary Judgment ("Simermeyer Aff.") ¶¶ 32–35. As a result, Simermeyer became involved in the Nation's economic development effort, and through various contacts met Mitchell Stanley, a representative of the Delaware Nation, and Ivy Ong, a Nevada businessman who had previously set up Indian nation gaming in Oklahoma. *Id.* ¶ 37, 39. Ong apparently was apparently interested in setting up casino operations on Unkechaug land. Simermeyer allegedly agreed to assist Ong in the venture, and provided his New York office as a base of operations for his wheeling and dealing. *Id.* ¶¶ 41–45.

Ong wasted no time in making contact with the Unkechaug and lining up support for his vision of a series of gaming operations on their land. Simermeyer Aff. ¶ 48. An agreement between the Nation and Stanley (allegedly backed by Ong) establishing a partnership to operate casino gaming was apparently signed on November 3, 2001. *Id.*, Ex. E.

Shortly thereafter, the Unkechaug apparently became aware of extensive malfeasance in Ong's past, including the collapse of a joint gaming operation with the Seminole Nation in Oklahoma. *Id.* ¶ 59. According to Simermeyer, the Nation became afraid that Ong's reputation would taint the public face of the venture. As a result, D. Scott Carruthers, lead plaintiff in this case, stepped into Ong's shoes to keep the project moving. *Id.* ¶ 61. Before 2002, Carruthers had been Ong's attorney and a principal of Carlo World Wide, Ong's Nevada organization. Defendants Rule 56.1 Statement, ¶¶ 8–9. He had extensive experience in the gaming industry himself, as well as a longtime connection to Ong. *Id.* ¶ 61, Declaration of D. Scott Carruthers in Opposition to Petri Motion for Summary Judgment ("Carruthers Decl. I") ¶ 4, *cf.* Simermeyer Aff. ¶ 46–47.

With the Unkechaug Nation on board, the next step was the establishment of operating entities for the Nation's future casino empire. By January 2002, Carruthers, along with Simermeyer and Stanley, set up the Springhawk and Summerhawk LLCs as vehicles for the operation of casino gambling and high-stakes bingo operations on Unkechaug land. Simermeyer Aff. ¶ 52. Stanley, Carruthers and Simermeyer were the principals of the new entities, with Carruthers holding a majority interest in each. *Id.*

The three allegedly entered into oral "operating agreements" which set out their respective responsibilities within the Springhawk and Summerhawk operations. Carruthers maintains that Simermeyer was appointed to serve as attorney for the Springhawk and Summerhawk operations. Declaration of D. Scott Carruthers in Op-

position to Simermeyer Motion for Summary Judgment ("Carruthers Decl. II") ¶ 18. He also contends Simermeyer agreed to act as his personal attorney in these dealings. *Id.* ¶ 20. Simermeyer concedes that he performed some legal work for Springhawk and Summerhawk, but he contends that any such work was incidental to his business function as an officer of the LLCs. Simermeyer Aff. ¶ 49.

The next step in the operation was to locate some "ancestral land" of the Unkechaugs that could serve as the site of the gaming operation, and, of course, investors to provide the necessary funding.

Towards that end, Simermeyer (perhaps through Wallace) introduced Carruthers to defendants Charles Petri, Alan Young and Gene Barbanti, who, in various permutations, controlled defendant entities The Barbanti Group, A.P. Equity Inc., Ancestral Reclamation LLC, and 3D Associates, LLC (collectively, "the Petri defendants"). Petri and Barbanti own and manage commercial real estate in upstate New York; Young is a partner in the Brooklyn law firm Lindenbaum & Young, who apparently performed legal work for Barbanti and Petri. He was also a principal of 3D Associates, one of the various operating entities controlled by Petri and Barbanti. Petri, Young and Barbanti represented to Carruthers that they were in possession of various parcels of land which could serve as sites for the Nation's gaming operations. Particularly, Petri offered two parcels of land in the town of Thompson in Sullivan County: first, a 35–acre property off Exit 106 of Route 17 ("the 106 Parcel"); second, an undeveloped 85–acre property off Exit 107 ("the 107 Parcel").[2]

Located on the 106 Parcel was a failed (or failing) shopping center known as the Apollo Mall. The parties imagined that the existing buildings on the property could quickly be converted into a casino until a more upscale project could be designed and built.

However, the 106 Parcel was subject to a $3.5 million dollar mortgage in favor of an entity known as ABC Pacific Realty LLC (formerly a defendant in this case); and a $200,000 lien in favor of the Sullivan County Industrial Development Agency ("IDA"). The property was encumbered as early as 1996, when the mortgage was held by the Bank of Kuwait; at that time, the parcel was owned by one Leo Ullman, under the name A.P. Equity Inc. (in some documents, "A.P. Equities"). Declaration of Gene Barbanti, Horn Aff., Ex H, ¶ 13(n). In fact, it appears that title was transferred to the Sullivan County IDA in 1987, with AP Equity retaining a long-term lease and the right to reclaim record title upon satisfaction of the debt owed to the IDA. *Id.* ¶ 13(c). In 1996, a tolling agreement was structured between the Bank of Kuwait, AP Equity, and the IDA, staying execution of the mortgage. *Id.* ¶ 13(n).

In 2000 or 2001, Barbanti, Young, and one James Messinger caught wind of the possibility of casino development on the site.[3] *Id.* ¶ 13(a). They then put together a deal to acquire the parcel, which entailed purchasing A.P. Equity from Ullman and buying out the Bank of Kuwait's interest in the mortgage. *Id.* ¶ 13(d)-(e). At first, a Bank of Kuwait representative informed Barbanti and his associates that the mortgage could be acquired for $750,000. In that belief, Barbanti, Young and Messing-

---

**2.** The 107 Parcel was sometimes called the "3D Industrial Park."

**3.** The record does not state whether the Unkechaugs were interested in casino development

some two years before the events in question, or whether some other nation was also seeking to start casino gaming in Sullivan County.

er proceeded to buy Ullman out. However, they apparently slipped up in their due diligence, because after they bought A.P. Equity, Barbanti and his associates learned that the mortgage was not owned by the Bank of Kuwait. It had been assigned to ABC Pacific. *Id.* ¶ 13(f).

Belatedly realizing the extent of A.P. Equity's liabilities, Barbanti caused A.P. Equity to file for Chapter 11 protection in May 2001, thus forestalling any action by ABC Pacific to foreclose on the 106 Parcel. *Id.* ¶ 13(g). A.P. Equities emerged from bankruptcy in February 2002, with its unsecured debt reduced but the mortgage on the 106 Parcel still extant.

After emerging from bankruptcy, A.P. Equity brought an action in State Supreme Court, Sullivan County, seeking to enjoin ABC Pacific from commencing an action to foreclose on the 106 Parcel, on the grounds that the transfer from the Bank of Kuwait was void. *Id.* ¶ 7.

On March 11 2002, A.P. Equity contacted ABC Pacific Realty's attorney and offered to acquire the mortgage for $1.65 million and a waiver of claim.[4] Horn Aff. Ex. E. ABC Pacific plainly did not accept the offer; indeed, there is nothing in the record to indicate that they responded at all. By letter dated March 28, 2002, A.P. Equity retracted its offer. *Id.* However, Petri contends that representatives of ABC Pacific continued to contact him about settling the mortgage. Petri Dep. at 125:13–22.

This was the point at which Petri and Barbanti met Carruthers and entered into negotiations for the various parcels. Carruthers was made aware of the existence of the $3.5 million mortgage on the 106 Parcel as part of the negotiations. Carruthers Decl. I, ¶ 9. However, he asserts

that Petri assured him that the mortgage could be removed and title cleared for $1.5 million, as part of resolving A.P. Equity's outstanding legal claims against ABC Pacific. *Id.* Carruthers was also told that the 107 Parcel was unencumbered (which appears to have been correct). *Id.* ¶ 8.

As the negotiations progressed, Carruthers and the Petri defendants put together an undated, unsigned "Draft Memorandum of Understanding." Simermeyer Motion for Summary Judgment, Ex. I. The Draft Memorandum speaks of a $13 million "price" (apparently for both parcels), including $3 million in cash or guarantees to "settle any claims, contingent or otherwise," to be "escrowed" with Young. *Id.* Of that $3 million, approximately $500,000 was termed the "minimum amount" needed to effectuate the transfer. *Id.* It also provides that the development of the Apollo Mall would be "fast-tracked" with the cooperation of the parties, and mentions that an "equal partnership" between Ancestral and Springhawk would be formed to develop a $125 million resort on the 107 Parcel. *Id.* The draft lists James Simermeyer as attorney for both the Nation and Springhawk. *Id.*

This draft was never signed. Instead, on or about April 26, 2002, Petri and Carruthers, on behalf of Ancestral Reclamation and Springhawk LLC respectively, signed a "Letter of Intent and Understanding" ("Letter of Intent") setting out the parties' plans for developing gaming facilities in Sullivan County. Carruthers Decl. II, Ex. F. The letter outlines a three-step plan for development of the Unkechaugs' newly-discovered ancestral land.

First, Ancestral was to deed the 106 Parcel to the Unkechaug in fee simple, and then renovate the Apollo Mall according to

---

4. Although all parties in this action speak of a $3.5 million mortgage, Barbanti's 2002 affidavit refers to a $4.6 million note. No effort is made to explain this discrepancy.

Springhawk's direction. *Id.* The Letter of Intent states that the parcel was "valued" at $2 million and was subject to a $3.5 million mortgage held by the Bank of Kuwait. The Letter contains the provision, "Ancestral shall indemnify the Nation and Spring Hawk LLC for any amount over $1.5 million paid to settle the claim by Kuwat [sic]" *Id.*

In Phase Two, a bingo facility would be developed on the 107 Parcel, which was also to be deeded to the Nation in fee simple as well. The 107 Parcel was "valued" at $11 million. *Id.*

Finally, in Phase Three, Ancestral was to build a gaming facility and residential development on an 1800–acre parcel at Mamakating, New York (in Orange County). That parcel was also to be deeded to the Nation. The parties did not specify a "value" of the parcel, but stated that net profits from the housing development were to be divided 20%, 15% and 65% between the Nation, Springhawk, and Ancestral respectively.

The Letter then contains the following inelegantly-phrased paragraph:

> It is further understood and the intent of the parties to give Spring and/or the Nation the right of first refusal to purchase a portion of the properties the properties [sic] controlled by Ancestral or it's [sic] affiliates in Sullivan County, including but not to [sic] properties off Route 17, N.Y. at Exit 107, Exit 106 and Mamakating, New York, at a fair and reasonable sale price.

*Id.* The Letter also includes the statement, "It is the understanding and intent of Spring Hawk LLC to compensate Ancestral for its participation in the development of the facilities for the operation of bingo facilities and other economic enterprises at the site developed by Ancestral for the Nation" (i.e., the three properties mentioned in the Letter).

The Letter concludes with the statement, "The parties agree to act in good faith and enter into an agreement that will encompass the intend [sic] and understanding set forth in this letter of intent and understanding." *Id.*

Nowhere in the Letter of Intent and Understanding does Ancestral commit to deliver any property to anyone for a stated price.

It was at this same time that Springhawk and Summerhawk entered into "gaming agreements" with the Nation, granting them a ten-year period to manage the Nation's casino operations, as well as rights to manage other economic opportunities on the land. There is no evidence that Petri or his associates were involved in these agreements in any way.

Also in late April 2002, an individual known as Ronald Seale surfaced, claiming to be an agent for Greg Norman, the professional golfer known as the "Great White Shark." He offered to invest $1.5 million in the venture, including $550,000 up front, in exchange for a share of the gaming operations. Petri Dep. at 87:9–24. Seale apparently was brought into the deal by Carruthers, although how he was identified as an investor remains something of a mystery. But Seale was offering what everyone else in the deal lacked: cash.

In a letter dated April 29, Carruthers memorialized what he believed to be Seale's position: Seale would advance $1.5 million in exchange for five "points" on the 106 and 107 Parcels. Carruthers Decl. I, Ex. A. According the letter, the first $550,000 would be provided that day (April 29), with $200,000 to follow within a few days and the rest available after the acquisition of a construction loan. *Id.*

This letter, along with a promissory note and guaranty agreement backed by Carlo

World Wide, were faxed to Seale. However, Seale proved unable or unwilling to front the money and the deal memorialized in the April 29 letter never happened Carruthers did not pursue him; by letter dated May 3, he simply asked for the note and guaranty back. Simermeyer Aff. Ex. L.

Having lost Seale, on May 1, 2002, Carruthers met with Simermeyer, Petri, Barbanti, Ong (and perhaps several others) regarding the need for an alternate source of funding so that the Nation could acquire the 106 and 107 Parcels. Carruthers contends that it was at that meeting that he was asked to advance the $550,000 himself. Carruthers Decl. I, ¶ 8. Carruthers asserts that he was hesitant to advance the money and sought various assurances to secure his loan. *Id.* He claims that he received such assurances, in the form of:

> (a) the representations of Petri about his and AP Equity's efforts to settle the Apollo Mall mortgage, his promise to indemnify Springhawk and the Unkechaug Indian Nation for any deficiency in that settlement amount, and his assurance that the Unkechaug's would receive clear title to the Apollo Mall; (b) the representations of Simermeyer that he would see to it that my $550,000 was secured by, among other things [not specified], the execution of a master lease agreement and a title insurance policy; and (c) the representations of Petri and Barbanti that the Exit 107 Parcel would be transferred to the Unkechaug Indian Nation within two weeks following the May 1 meeting.

Carruthers Decl. II, ¶ 39. Armed with these promises, Carruthers agreed to provide the funds. *Id.* ¶ 41.

Petri's version of the May 1 meeting is somewhat different. He asserts that Carruthers was eager to invest in the venture, and had already arranged for Ong to provide $350,000 in funding while he put up $200,000 of his own money. Petri Dep. at 94:2–8. Petri also asserts that the only Parcel being discussed was the 106 Parcel, and that the participants understood that the 107 Parcel would be available—for an additional $11 million—at some point in the future. *Id.* at 97:4–11.

As for the mortgage on the 106 Parcel, Petri acknowledges that he believed he could settle the mortgage for $1.5 million and told Carruthers this during the negotiations. *Id.* at 126:8–14. Petri also states that ABC Pacific was still interested in settling the mortgage, and that between March and May 2002, they were calling "all the time" to try to work out a deal. *Id.* at 124:23–24.

About this time, the Unkechaug received an opinion from the law firm of California firm of Monteau & Peebles LLP. Simermeyer Motion for Summary Judgment, Ex. N. It appears that the Nation solicited the firm to look into the legality of gaming operations on Unkechaug land. The Monteau & Peebles letter opined that the Unkechaug had no standing under the IGRA to commence gambling operations without federal recognition. *Id.* The firm also considered and rejected a number of alternative legal arguments that would have supported starting a gambling operation without federal recognition. *Id.* Therefore, at least as of late April, the Unkechaug had little reason to believe they could legitimately open a gaming operation on their "ancestral land."[5]

---

**5.** It appears to have been the Unkechaugs' original contention that, because they lacked federal recognition, they were free, as a sovereign power, to operate casino gaming without either state or federal regulation. Monteau & Peebles found this argument to be meritless,

It is not clear whether the Monteau & Peebles opinion was disseminated to the people who were preparing to close the land deal. If it was, the bad news did not appear to slow the acquisition down. According to Petri, he and Simermeyer then worked up a plan to transfer the money from Carruthers and his backers through Young. Petri Dep. at 83:15–19. He also spoke about "clearing up" the IDA and acquiring title insurance for the 106 Parcel. *Id.* Carruthers transferred $550,000 to Simermeyer in two installments— $350,000 on May 3 and $200,000 on May 10—to be transferred to Young. Carruthers Decl. I, ¶ 11.

Simermeyer deposited the two checks in Young's IOLA account: one for $349,000 (dated May 3) and the other for $200,000 (dated May 10), leaving $1,000 in his own account. Affidavit of Alan Young ¶ 3. These checks bore memoranda reading "purchase Apollo Shop Center 106 Exit off 17" and "Unkechaug & Apollo A.P. Equity" respectively. Motion, Exs. E–F. The letter accompanying the first check, dated April 1, sent from Simermeyer to Young, contains the following language:

> Pursuant to the direction of your client Chuck Petri, I have deposited a check in the amount of $350,000 [sic] in your IOLA account for closing of the Apollo Shopping Center. . . .

> The funds will be released to close title of the property to the Unkechaug Indian Nation either from A.P. Equities Inc. to the Unkechaug Indian Nation or by assignment of title (Via IDA and Court) by A.P. Equities Inc to the Unkechaug Indian Nation or conveyed as a straw man

by A.P. Equities Inc to the Unkechaug Indian Nation.[6]

Simermeyer Motion for Summary Judgment, Ex. S.

In his letter dated May 8, Carruthers reminded Simermeyer to "make sure we are protected on the acreages off of exit 106 and 107 described in Phases I and II of said letter via a duly executed master lease agreement prepared by you and held in your control." Declaration of John Horn in Support of Plaintiff's Opposition to Simermeyer's Motion for Summary Judgment, Exhibit E. The letter also asked for copies of Springhawk's contracts, and copies of records regarding the disbursements regarding the $550,000 that Carruthers had provided.

By letter to Carruthers dated May 9, 2002, Simermeyer acknowledged receipt of the $200,000 check, and noted that the 106 Parcel had already been transferred on May 6. *Id.*, Ex. G. He described the additional funds as designed to cover payments for taxes, the IDA lien, and title insurance. Simermeyer also noted the remaining outstanding mortgage held by the bank of KUWAT [sic] in the amount of $3.5 million, but that "Chuck" [presumably Charles Petri] has stated that he would reimburse any amount over $2.5 million (not $1.5 million, as stated in the Letter of Intent) to settle the mortgage. *Id.*

Young accepted the funds and distributed them on instructions provided to him by Petri. Affidavit of Alan Young, ¶¶ 6, 9. Pursuant to those instructions, Young paid off the $200,000–plus lien in favor of the Sullivan County IDA and paid $100,000 to accountants and insurance providers. He also paid $50,000 to Colonial Real Estate

---

as did this Court when it was raised before me in *Carruthers I*, 365 F.Supp.2d at 465.

**6.** Young contends the letter bears the wrong date (April 1, 2002). Since all discussions regarding Carruthers' investment took place

well after April 1 and the check purported to have been deposited in the Young IOLA account was dated May 3, 2002, Young is obviously correct.

Services (allegedly part-owned by Petri), $50,000 to Barbanti in fees, $75,371.25 to himself for legal fees, and $9,315 to his firm Lindenbaum & Young. In total, he disbursed $514,075.63 of the total—leaving approximately $34,000 of the $549,000 unspent. Horn Aff. in Opp. to Petri and Young, Ex. F. He also delivered the deed to the 106 Parcel (and a correction thereto) in favor of the Unkechaug Indian Nation to the Tremper Hiatt Abstract Company for recording. *Id.* ¶ 7. The parties do not contest the fact that the deed to the 106 Parcel was duly recorded with the Sullivan County Clerk. The 107 Parcel was never transferred, and remained in the possession of 3D Associates.

Young claims to have been uninvolved in the negotiations up to this point and unaware of the details of the agreement between Carruthers, Petri, and the others. There is no evidence that he was present at the May 1 meeting or had a hand in drafting the Letter of Intent, which he did not sign in any event.[7] Carruthers concedes that he did not personally enter into an escrow agreement, or have any direct communication with Young between the May 1 agreement and at least May 10. Deposition of D. Scott Carruthers at 56:19–24, 60:14–15.

After the transfer of the 106 Parcel, the Petri defendants—specifically Barbanti—continued to collect rent from the Apollo Mall tenants. Petri asserts that he continued to write checks in excess of the total amount of rent collected to pay heating bills and to repair water damage on the property. Petri. Dep. at 98:12–23. Petri further asserts that Carruthers wanted

Barbanti to continue to manage the property until he formed a plan as to how to manage the property. *Id.* at 98:2–6.

But the record contains little evidence about what happened to cause the venture to fall apart. It was alleged in plaintiffs' first (unamended) complaint that, on or around May 15, the mortgage held by ABC Pacific was transferred to new owners—Stanley Gallant and LJM Enterprises, prior defendants in this case—who had no interest in settling, but I see no confirmation of that allegation here. First Cmplt., ¶¶ 44, 45.

The only other evidence about the parties' conduct post-transfer is a series of letters from Simermeyer to Petri regarding Petri's unfulfilled obligations to the enterprise. The first letter, dated July 24, 2002, requests that Petri turn over $300,000 that he had allegedly promised to provide to the Nation to support its efforts to build the casino, as well as the Nation's mounting bills for its lobbying, legal and public relations efforts.[8] Horn Decl. Ex. I. Simermeyer further complained of Petri's failure to provide an accounting of financial and tenant relations issues related to the Apollo Mall after the transfer. Finally, the July 24 letter complains of increasing tension between the Nation and Carruthers, who had allegedly spoke to Petri "numerous times to resolve the issue of his involvement in this venture (including payment of $550,000.00 to obtain title in the Apollo Shopping Center)." *Id.* There had apparently been some discussion of buying Carruthers out, and Simermeyer apparent-

---

7. Young *was* a principal of 3D Associates, owner of the 107 Parcel, the transfer of which was plainly being negotiated in April and May, 2002. For this reason, one could infer that he had some knowledge of, if not control over, the negotiations between Petri and Carruthers.

8. There is no evidence prior to this letter of any promise to provide $300,000 per annum to the Nation. Simermeyer's letter does not mention how this agreement was made.

ly sought to determine the status of their dealings.

Simermeyer's next letter, dated August 21, takes a much more serious tone, questioning for the first time (at least in writing) why the 107 Parcel was not transferred to the Nation along with the 106 Parcel. Horn Decl. Ex. J. According to the letter, the Town of Thompson was considering a "pilot agreement," the details of which are not provided. By that date it appears that the Apollo Mall was in foreclosure and that proceedings were well advanced; the letter calls the extant $3,000,000 mortgage 'alarming' and asserts that it was "imperative" that the 107 Parcel be transferred to Springhawk to keep the venture alive *Id.*

One month after that, on September 16, Simermeyer made a "final demand" for an accounting of how Carruthers' $550,000 [really $549,000] had been used, as well as all rents received from Apollo tenants. He also demanded that Petri provide funds and turn over title to the 107 Parcel to the Nation, as promised. Horn Decl. Ex. K. Simermeyer gave Petri until September 18 to reply to his demands. *Id.* No response to any of these letters is provided.

Thereafter, ABC Pacific (or perhaps the new mortgage holder) foreclosed on the property, and the casino venture fell into desuetude—joining dozens of other similarly failed ventures in Sullivan County. The property was acquired by ABC Pacific at public auction. Carruthers, Simermeyer, Petri and Barbanti were notified of the impending sale by letter from Gerald Orseck, an attorney apparently involved in the project, on October 2, 2002.[9] Young and Petri Reply Memorandum of Law, Ex. X. The letter urged the parties to take some action to head off the foreclosure, but apparently this advice was not followed. *Id.*

Carruthers then filed his first complaint, asserting some twenty-seven causes of action, most of which were dismissed by this Court in *Carruthers I.*

Carruthers, with leave of this Court, amended his complaint to assert twelve causes of action against many of the original defendants, plus a few new ones: four claims of malpractice, self-dealing, and breach of the duties of loyalty and good faith against Simermeyer, Wallace, and their former law practice Simermeyer & Wallace (Claims I—IV); claims of fraud and breach of contract against Petri, Barbanti, Young, and their various operating entities (Claims V and VII); claims of fraud and breach of contract against David Flaum and Flaum Management (Claims VI and VIII) and a related claim against the Petri Defendants as the agents of the Flaum defendants (Claim IX); one claim of breach of fiduciary duty as an escrow agent against Young and his firm Lindenbaum & Young (Claim X); and finally claims of unjust enrichment against defendant ABC Pacific (Claim XI) and 3D Associates and Barbanti (Claim XII).

Plaintiffs also revised their request for damages. In the original complaint, they sought in excess of $750,000,000, which was the amount they thought the Tribe and Carruthers would have made if the entire project had come to fruition. In the amended complaint, Carruthers simply wants his $550,000 back, plus interest. Neither Springhawk nor Summerhawk have asserted independent claims for damages. Plaintiffs also seek $1.5 million from Simermeyer, which includes, but is not

---

**9.** Orseck is currently representing the Petri defendants and Young defendants in this matter.

limited to, legal fees which Simermeyer received.

In *Carruthers II,* this Court dismissed Claims III and XI of the Amended Complaint in their entirety, and Claim IV insofar as it stated a claim against Simermeyer as a principal in the Springhawk and Summerhawk LLCs. Plaintiffs' claims against Wallace and the law firm of Simermeyer and Wallace were also dismissed. The remaining claims—for breach of contract and fraud against Petri and Flaum, unjust enrichment against 3D Associates, breach of fiduciary duty against Young, and legal malpractice against Simermeyer personally—withstood the motion.

After discovery, the parties filed a barrage of motions: Simermeyer for summary judgment on Claims I—IV, Petri and his associates for summary judgment on Claims V and VII; Flaum for summary judgment on claims VI and VIII; and Young for summary judgment on Claim X. Flaum and Simermeyer also sought sanctions pursuant to Rule 11.

### Discussion

Under Federal Rule of Civil Procedure 56(c), the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–33, 106 S.Ct. 2548. On a motion for summary judgment, the court views the record in the light most favorable to the non-movants and resolves all ambiguities and draws all reasonable inferences against the movants. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir.1987).

I consider each set of defendants in turn.

### I. The Flaum Defendants

I begin with David Flaum and Flaum Management Company because—as should be apparent from the above recital of the relevant facts—they have absolutely nothing to do with this entire venture (as plaintiffs now concede).

David Flaum (with Flaum Management Company Inc., the "Flaum Defendants") is a real estate developer in Rochester, New York. Cmplt. ¶ 76. He apparently came to know Barbanti through several unrelated land deals in Sullivan County (Deposition of David Flaum at 32:4–12) and had been represented by Alan Young several years earlier in a failed attempt to acquire the fabled Grossinger's resort. Young Dep. at 42:7–13. According to an article in the *Sullivan County Democrat,* Flaum and Petri were working together in 2000 to acquire the Concorde Hotel and turn it into an Indian casino. Jeryl Abramson, *The Royal Treatment? (Part 2),* Sullivan County Democrat, May 23, 2000 at http://www.yasg urroad.com/jery l/jeryl20000523 .html.

In mid–2002, Flaum was put in touch with Chief Wallace. There is no record evidence about what was said in their conversation, but plainly they discussed gambling, because on or about May 16, Flaum sent a letter to Wallace, through Simermeyer, thanking him for "the opportunity... to develop a Class III gaming facility in Sullivan County." Horn Decl., Ex. A. Both before and after that date, several newspaper articles were published that

linked Flaum to A.P. Equity and the ownership of the Apollo Mall, and suggested that Petri and Barbanti were acting as Flaum's proxies. *See* Ben Montgomery, *Future Brightens for Apollo Plaza,* Times Herald–Record, Feb. 25, 2002 at http://www.th-r ecord.com/archi ve/2002/02/25/b mapollo.htm; Ben Montgomery, *Apollo Mission: Find an Owner,* Times Herald–Record, Oct. 9, 2002, at http://www.th-r ecord.com/archi ve/2002/10/09/b mapol-lo.htm.

However, aside from Flaum's "thanks for the meeting" letter and these speculative articles (which are rank hearsay and prove nothing), there is no evidence that anything ever happened between Flaum and the Unkechaug. Nonetheless, on this flimsy basis, plaintiffs named the Flaum interests as defendants in this case, alleging that they were in fact the principals behind the failed real estate deals. Discovery failed to unearth any connection between Flaum and the various other defendants in this case—no evidence links him to the parcels or to the other defendants in connection with the Unkechaug deal, and the uniform testimony of all deponents establish that Flaum was not involved in the negotiations over the 106 and 107 Parcels. At the close of discovery, the Flaum defendants moved for summary judgment and sanctions. Before those motions were filed with the court, plaintiffs— responding to a Rule 11 motion that had been served on them—offered to withdraw their complaint against the Flaum defendants. They now ask this court to enter an order of withdrawal pursuant to Fed. R.Civ.P. 41(a)(2).

Since plaintiffs concede that there is no evidence to support their claim against the Flaum Defendants, the Flaum defendants are entitled to have judgment entered in their favor. The question is whether they are entitled to have their motion for sum-mary judgment granted, or whether plaintiffs are entitled to withdraw their claims. That depends on whether plaintiffs timely and fully responded to the Rule 11 motion that was served on them by bringing themselves within the "safe harbor" of that rule.

Federal Rule of Civil Procedure 11 requires that all representations made to the court, "have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). "Appropriate sanction," including monetary penalties, may be imposed on the attorneys or parties who violate Rule 11(b).

In 1993, an amendment to Rule 11 created the so-called "safe harbor" provision of Fed.R.Civ.P. 11(c)(1)(A). Pursuant to the safe harbor provision, a motion for sanctions must be served on the offending party before being filed with the Court. The offending party may avoid sanction by withdrawing the allegedly wrongful pleading within 21 days. *Id.*

In this Circuit, compliance with the procedural requirements of Rule 11 is mandatory. Sanctions may not imposed if the party seeking them failed to comply with the technical requirements of Rule 11. *Perpetual Secs. Inc. v. Tang,* 290 F.3d 132 (2d Cir.2002). Indeed, the Simermeyer defendants' motion for sanctions was denied on that basis in *Carruthers II,* 388 F.Supp.2d at 381.

The Flaum Defendants did not file a Rule 11 sanctions motion at the outset of the case, when they moved to dismiss the complaint. In fact, they did not file such a motion until discovery had concluded. Then, on October 12, 2005, the Flaum defendants served plaintiffs with their motion for Rule 11 sanctions. Affidavit of

John Horn in Opposition to Defendant's Motion for Sanctions, ¶ 21.

On November 3, 2005—the twenty-second day[10] after service of the proposed Rule 11 motion on plaintiffs—Mr. Horn (plaintiffs' counsel) responded by offering to withdraw all claims against the Flaum Defendants. *Id.* ¶ 23. Because it was too late for the claims to be withdrawn unilaterally, see Fed.R.Civ.P. 41(a)(1)(i), he sent his opponent a stipulation of dismissal, with prejudice and without costs to either side. The Flaum defendants declined to execute the stipulation, because it did not provide for reimbursement of their attorneys' fees. Instead, on November 18, they filed their motions for sanctions and for summary judgment with this Court.

The Flaums' rejection of the stipulation led plaintiffs to make their cross-motion for permission to withdraw the claims pursuant to Fed.R.Civ.P. 41(a)(1)(ii), which provides that claims may be withdrawn after the filing of an answer either by stipulation of the parties or by leave of the court. Plaintiffs claim that they complied with the statutory safe harbor provision of Fed R. Civ. P. 11(c)(1)(A) by agreeing to withdraw their claims.

The first issue is the timeliness of plaintiffs' response. I strongly suspect that plaintiffs responded to the Rule 11 motion is a timely fashion under the safe harbor rule. However, I cannot tell for sure on the record before me. I know sent their response to the Rule 11 motion on the twenty-second day following service. The rule by its terms gives them 21 days to respond. However, if defendants' motion for Rule 11 sanctions was served on plaintiffs via first class mail, they are entitled to a *three-day enlargement of time* under Fed.R.Civ.P. 6(e), giving them 24 rather 21 days within which to respond. The problem is that the record does not reveal whether the motion was served by hand or by mail.[11]

Therefore, plaintiffs must advise the court by letter, within three days after their receipt of this opinion, how the motion was served on them. Until I have that information I cannot issue a final ruling on either the Flaum Defendants' motion for summary judgment or the plaintiffs' motion for leave to withdraw their claims.

■ I reject categorically the Flaum Defendants contention that plaintiffs' response was not timely because it was served *six months* too late.

In *Carruthers I,* I characterized plaintiffs' complaint against the Flaum as a "fishing expedition" and stated that plaintiffs and their counsel left themselves open to sanction if the alleged agency relationship between Flaum and the other defendants proved illusory. 365 F.Supp.2d at 474. The Flaum Defendants argue that this court's skepticism about the claims against them constituted "notice" to plaintiffs that was equivalent to the service of motion papers for 11(c)(1)(A) purposes, and started the 21 day period running last March—not on October 13.

That, with respect, is utter nonsense.

No law supports defendants' suggestion that a remonstrance from this Court constitutes some type of "constructive notice" for Rule 11 purposes. The rule requires the service of a motion by the party seeking sanctions in order to start the clock.

---

**10.** The day of service (October 12) does not count toward the 21 days; as is always the case, counting begins on the day following service (October 13).

**11.** The fact that defendants do not argue the "twenty-second day" point is at least a clue that the Rule 11 motion was in fact served by mail.

The Second Circuit does not permit any variation on that procedure.

Moreover, while I expressed skepticism about plaintiffs' claims against the Flaum—skepticism that discovery has borne out—not only did I not require plaintiffs to withdraw their pleading against Flaum, I denied a motion to dismiss those claims. One cannot argue with a straight face that the court's denial of a Rule 12(b)(6) motion constitutes "constructive notice" that the claims are frivolous enough to warrant sanctions.

Defendants rely on *Cardillo v. Cardillo*, 360 F.Supp.2d 402 (D.R.I.2005), in which my colleague in Rhode Island granted a sanctions motion despite non-compliance with Rule 11(c)(1)(A). In that case, defendants served a facially improper Rule 11 motion upon plaintiffs. The district court found such technical non-compliance no bar to recovery. The Seventh Circuit has taken a similar position, by permitting a "letter or demand" to be sent in place of the motion itself. *Nisenbaum v. Milwaukee County*, 333 F.3d 804 (7th Cir.2003).

However, this short answer to these cases is that they are not good law in the Second Circuit. *see Gal v. Viacom Intern. Inc.*, 403 F.Supp.2d 294, 309 (S.D.N.Y. 2005).[12] The law in this Circuit is clear: the only way to start the 21 day clock running is for a party seeking sanctions to serve a fully supported motion. In this case, that happened on October 12 (with counting beginning on October 13)—not last March.

■ The next question to resolve is whether plaintiffs' sending of the stipulation of withdrawal (assuming it to be timely) brings them within the safe harbor. Defendants also argue that plaintiffs' offer to withdraw their claims does not meet the requirements of Rule 11. I cannot agree.

The rule requires that the challenged claims be "withdrawn or appropriately corrected" within the 21 (or 24) day time period. Plaintiffs sent defendants a stipulation that would have ended their case against the Flaum Defendants. Plaintiffs' counsel signed the stipulation. Since this is not a circumstance in which Rule 41(a)(1)(ii) permits withdrawal of the complaint unilaterally, it is hard for me to see what more plaintiffs could have done to "withdraw" their pleading.

■ The text of Rule 11 does not specify what constitutes the "withdrawal" of a challenged claim. However, the Rules Committee Notes to the 1993 revision make plain that withdrawal need not be a formal affair: "If, during this [21–day] period, the alleged violation is corrected, as by withdrawing (whether formally or informally) some allegation or contention, the motion should not be filed with the court." Advisory Committee's Note (1993). What little case law exists in this Circuit holds that if a party indicates an intention to withdraw a contested claim during the safe harbor period, that suffices—even if additional steps remain to be taken under Rule 41. *See Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, 216 F.R.D. 29 (E.D.N.Y.2003); *Mass. Connection Inc. v. City of Hartford*, No. 3:05 Civ 485, 2005 WL 2123534, 2005 U.S. Dist. LEXIS 19894 (D.Conn. Sept. 1, 2005). So as long as the plaintiff takes some step leading to the withdrawal of the offending claim—whether offering to withdraw the claim or moving for leave to withdraw them—Rule 11 will be satisfied, even if it takes longer for the requirements of Rule 41 to be completed.

---

**12.** Or in several other circuits that have considered the question: *See Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 788–89 (9th Cir. 2001); *Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir.1997)

At least where a motion is made, it will rarely be possible for a court to adjudicate a motion for leave to withdraw claims within the 21 day period. *Team Obsolete Inc.,* 216 F.R.D. at 44 n. 12. Of course, here the plaintiffs did not make a motion for leave to withdraw their claims. They send a stipulation of withdrawal for defense counsel's signature. But it defies logic to suggest that a defendant who has served a Rule 11 sanctions motion could render a plaintiff out of time for safe harbor treatment by refusing to sign a stipulation of withdrawal that is timely proffered. By serving the motion, the Flaum defendants indicated that they wanted the claims withdrawn. Plaintiffs clearly and unmistakably granted their request. Rule 11 requires no more.

■ Defendants' final contention—that they were not bound to sign a withdrawal which contained a waiver of a claim of attorneys' fees—can be disposed of quickly. Plaintiffs' letter and proposed stipulation (for that matter, the letter alone) were sufficient to provide informal notice to the Flaum defendants that Claims VI and VIII would be withdrawn. The stipulated dismissal was conditioned only on assignment of costs to each side—a term wholly in line with the language of Rule 41, which does not generally impose costs on a plaintiff who voluntarily withdraws a claim. Fed. R.Civ.P. 41(a) (2000). This follows the so-called "American Rule," which holds that the prevailing party in litigation will bear its own costs, absent a statutory provision or contractual term to the contrary. *U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 74 (2d Cir.2004). Nothing in Rule 11 requires a plaintiff to agree, as a condition of withdrawing claims, to reimburse his opponent for attorneys' fees already expended. Thus, plaintiffs' proffer of a stipulation of dis-

missal is sufficient to satisfy the safe harbor requirement of Rule 11.

For the above reasons, plaintiffs will prevail if they in fact timely availed themselves of the safe harbor provision. If they did not—and if they fail to demonstrate "excusable neglect" for failing to do so—then defendants will be entitled to summary judgment and I will deal with the issue of sanctions in a subsequent opinion.

## II. The Petri Defendants

### A. Breach of Contract

According to Carruthers, plaintiffs entered into a complete and binding contract with the Petri defendants for the transfer of both the 106 and 107 Parcels, on terms contained in the April 26 "Letter of Intent and Understanding," read together with (1) the undated "Draft Memorandum of Understanding;" (2) the oral assurances allegedly made at the May 1 meeting involving Simermeyer, Carruthers, Petri, et al., and (3) the parties' subsequent course of conduct.

This alleged contract comprised the following terms: the two parcels, which were "valued" at a total of $13 million in the Letter of Intent, would be transferred to the Nation—the 106 Parcel almost immediately, and the 107 Parcel by May 15—in exchange for $550,000 from Carruthers for fees and costs. It is plain from Carruthers' contentions against Young, *infra,* that the $550,000 was not intended by him as a payment to Petri for the land, but rather a cash advance to pay for insurance, the IDA lien on the 106 Parcel, and other necessary costs. The Petri defendants agreed also use their best efforts to settle or reduce the amount of the mortgage and further agreed to indemnify plaintiffs for any amount plaintiffs had to pay over and above $1.5 million to get rid of the mort-

gage, which would give the Nation clear title to the parcel.

Plaintiffs do not spell out what defendants were to receive in exchange for this extremely generous arrangement, but I infer that it was a share in the profits of the gaming operations and the Mamakating development project once they got off the ground.

Plaintiffs further assert that, after agreeing to those terms, the Petri defendants breached the agreement twice: first, they did not transfer the 107 Parcel to the Nation within fourteen days as they had agreed; and second, they never acted on their promise to reduce the mortgage or clear title to the 106 Parcel.

The Petri defendants argue that the Statute of Frauds offers a complete defense to any claim for breach of contract.

Because the legal issues surrounding each Parcel are distinct, I address each in turn.

### 1. The 107 Parcel

The alleged promise to transfer the 107 is plainly a contract for the sale of land, and as such must satisfy the New York Statute of Frauds.

■ The Statute of Frauds, codified at N.Y. Gen. Obl. L. § 5–703, requires all contracts for the sale or long-term lease of real property to be in writing and subscribed to by the party charged. The writing itself "must designate all parties, identify and describe the subject matter and state all of the essential terms of a complete agreement." *Wacks v. King,* 260 A.D.2d 985, 986, 689 N.Y.S.2d 298 (3d Dept.1999). "The writing must set forth the entire contract with reasonable certainty." *O'Brien v. West,* 199 A.D.2d 369, 370, 605 N.Y.S.2d 366 (2d Dep't 1993). Where a written instrument is facially insufficient, consideration of parol evidence

cannot redeem it. *See Wacks,* 260 A.D.2d at 987, 689 N.Y.S.2d 298.

■ It goes without saying that the convoluted combination of drafts, signed letters of intent, oral representations and other "promises" that Carruthers contends constitutes his entire contract is not the sort of arrangement that meets the requirements of the Statute of Frauds. The only question is whether there exists some writing that sets forth all of the essential terms of a promise to transfer the 107 Parcel. The answer is no.

■ There is only one document before me that could satisfy the Statute of Frauds: the April 26 Letter of Intent, which is the only document signed by the party to be charged (Petri).

The Letter does identify the parties and makes plain that, as part of an overall project contemplating the development of three separate properties (the 106 and 107 Parcels and the Mamakating property), title to the 107 Parcel was to pass to the Nation.

Neither the price for the land nor the time at which title is to pass is set forth in the Letter. Nor does the Letter specify how the transfer of the 107 Parcel relates to any of the rest of the overall deal.

The Petri defendants argue that, in light of the final sentence of Letter (stating the parties intention to deal in good faith to draft a final agreement in the future), the Letter of Intent is merely an 'agreement to agree' and thus does not satisfy the Statute of Frauds.

■ "A preliminary 'agreement to agree' . . . is unenforceable under the Statute of Frauds." *Checkla v. Stone Meadow Homes, Inc.,* 280 A.D.2d 510, 511, 720 N.Y.S.2d 532 (2d Dep't 2001). What the Petri defendants are really arguing that they did not enter into a final and binding

contract memorializing the terms of the sale of the 107 Parcel. If the parties have not reached a final agreement on the fundamental terms of the deal, no *contract* has been formed, so compliance with the Statute of Frauds is immaterial. Contrariwise, if two parties reach a true "meeting of the minds" and draft a preliminary document that states with sufficient specificity all material elements of the agreement, the Statute of Frauds is satisfied, even if the parties contemplated redrafting that document. *See Tymon v. Linoki,* 16 N.Y.2d 293, 298, 266 N.Y.S.2d 357, 213 N.E.2d 661 (1965).

There can be no question that the Letter of Intent does not constitute a completed contract for the sale of the 107 Parcel (or, for that matter, for the 106 Parcel). The signed Letter lacks two "material elements" of a completed agreement: the time at which the 107 Parcel is to be transferred (according to the testimony, that date was not chosen until a week after the Letter was signed) and the consideration for that transfer. Both of these missing elements are material under New York law. *See Donner v. Septimus,* 137 A.D.2d 484, 485, 524 N.Y.S.2d 454 (2d Dep't 1988).

The Letter does mention that the "value" of the 107 Parcel was $11 million. But "value" is not the same thing as "purchase price." Nowhere in the letter does Carruthers agree to pay $11 million for the 107 Parcel, and indeed, he apparently thinks the land was supposed to be transferred to the Tribe for no immediate consideration at all—just a share in the future profits of the non-existent casino and development project. No such form of consideration is tied to the transfer of the 107 Parcel anywhere in the Letter of Intent.[13]

Plaintiffs offer no explanation of the term "value"—they appear to read it out of the agreement entirely. Petri contends that value means "price"—that he was willing to part with the 107 Parcel, but only upon payment of $11 million. An earlier, unsigned "Draft Memorandum" suggests that Petri's assessment it correct: it sets the "price" for the two parcels at $13 million, equal to the "values" of the 106 and 107 Parcels. However, that document was never signed by the party to be charged (Petri) and is not mentioned in the Letter.

Thus, I am left with (at best) an ambiguous price term, the most essential element of any contract. Therefore, on its face, the Letter of Intent does not satisfy the Statute of Frauds insofar as it discusses the sale of the 107 Parcel.[14]

Plaintiffs offer three reasons why extrinsic evidence should be considered to transform the flawed Letter (which Plaintiffs do not argue satisfies the Statute) into an enforceable agreement: first, that parol evidence may be considered to elucidate ambiguous terms of the Letter; second, that the doctrine of partial performance, taken with an incomplete written instrument, is sufficient to satisfy the Statute of Frauds; and third, that the Letter is a binding "preliminary agreement" under the Second Circuit's holding in *Arcadian*

13. The Letter does refer to the Mamakating Parcel, which was to be transferred to the Nation and developed, with all three entities (the Nation, Springhawk/Carruthers, and Ancestral/Petri) sharing in the profits from the development of that venture. Nowhere in the letter is it stated or even suggested that the profits from the Mamakating venture are the payment for transferring title to the 107 Parcel.

14. The only way to make the price term unambiguous is if the "price" was $11 million, in which case there was no breach, since plaintiffs never tendered $11 million for the 107 Parcel.

*Phosphates v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989). None of these arguments works.

### i. Parol Evidence Is Not Admissible to Elucidate the Terms of an Incomplete Writing Under the Statute of Frauds.

▉ Plaintiffs' contention that extrinsic parol evidence may be admitted to elucidate the terms of the written agreement is incorrect. As stated above, parol evidence is not admissible to clarify an incomplete written instrument under the Statute of Frauds. *Wacks*, 260 A.D.2d at 987, 689 N.Y.S.2d 298. *Tobin v. Union News Co.*, 18 A.D.2d 243, 244, 239 N.Y.S.2d 22 (4th Dep't 1963), on which plaintiffs rely, dealt with a lease agreement in which the parties' respective obligations were, in the opinion of the court, "neither meaningless nor ambiguous," and thus satisfied the Statute of Frauds. The document omitted only certain "specifics of implementing" the lease agreement. *Id.* That is not the case here. The Letter is at best ambiguous (and really, is wholly silent) about how defendants were to be compensated for the 107 Parcel and when plaintiffs were to take title.

▉ Moreover, the parol arrangement (allegedly made at the May 1 meeting) that the 107 Parcel would be transferred without additional consideration within two weeks did not "clarify" anything in the Letter of Intent. Rather, it rewrote several key elements of that letter. The Letter of Intent called for the passage of title as Phase II of a three-part development project; the alleged oral May 1 deal called for the 107 Parcel to be transferred by May 15, well before the completion of Phase I of the overall project. Moreover, the Letter of Intent did not mention anything about a down payment for the 107 Parcel and did not link the transfer of that parcel to the transfer of the 106 Parcel, while the purported parol deal called for a $550,000 "down payment" for both the 106 and 107 Parcels and required that title pass to the Tribe without any further payment. This is plainly a different deal from described in the Letter of Intent. Even plaintiffs concede that parol evidence may not be considered to contradict the terms of a written agreement. *Id.* at 245, 239 N.Y.S.2d 22. If, under the Statute of Frauds, parol evidence is inadmissible to cure ambiguities in a written instrument, it is certainly inadmissible as evidence of a later modification of the written agreement.

### ii. The Doctrine of Partial Performance Is Inapplicable Where the Parties' Conduct Was Not Unequivocally Referable to an Oral Agreement.

▉ Second, Plaintiffs argue that doctrine of partial performance may be invoked to bind defendant to the terms of an oral agreement in light of both parties' subsequent performance.

▉ The doctrine of partial performance in New York is grounded in equity and codified as part of the New York Statute of Frauds. N.Y. Gen. Oblig. Law § 5–703(4) (2006). Simply put, the doctrine holds that an otherwise unenforceable contract for the sale of land may be enforced in equity if plaintiff has relied on defendant's promise and performed some or all of the oral agreement. The doctrine is based on the fact that it would be fraudulent to permit a defendant to escape performance on a contract after the plaintiff has performed in reliance on an ultimately unenforceable agreement. *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Grp. PLC*, 93 N.Y.2d 229, 235, 689 N.Y.S.2d 674, 711 N.E.2d 953 (1999).

▉ However, the doctrine of partial performance may only be invoked where

the performance is "unequivocally referable" to the agreement. *Id.* (citing *Burns v. McCormick,* 233 N.Y. 230, 232, 135 N.E. 273 (1922)). For plaintiff's actions to be unequivocally referable to the agreement, they must be " 'unintelligible or at least extraordinary', explainable only with reference to the oral agreement." *Anostario v. Vicinanzo,* 59 N.Y.2d 662, 664, 463 N.Y.S.2d 409, 450 N.E.2d 215 (1983).

In this matter, plaintiffs assert that defendants' transfer of the 106 Parcel, clearing of the IDA lien, and acceptance of plaintiffs' money permit this Court to consider evidence of defendants' alleged promise to transfer the 107 Parcel to the Tribe two weeks later.

But nothing about those actions is "unequivocally referable" about either party's actions in this case. Plaintiffs paid $549,000 and received in exchange a parcel of land (the 106 Parcel) that, according to the Letter of Intent, had a "value" of $2 million. That transaction stands on its own. Carruthers avers that the 107 Parcel was supposed to be transferred as part of the same deal, but Petri says otherwise. While I am not a trier of fact here, the circumstances strongly suggest that it is Petri rather than Carruthers who should be believed; however, I do not have to credit Petri's version of events to find the doctrine of partial performance inapplicable. The fact that he *could* have arranged to transfer the 106 Parcel, and only the 106 Parcel, for $549,000 suffices to defeat plaintiffs' argument.

I need not reach the Petri Defendants' alternative argument that plaintiffs would be unable to collect money damages under the doctrine of part performance.

iii. *The Letter of Intent Is Not A Binding Preliminary Agreement Under the Standard Set Out in Arcadian Phosphates.*

■ As a general rule, a contract requires a final meeting of the minds; mere "agreements to agree" are not binding. *See supra; see also Joseph Martin Jr. Delicatessen v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981). New York courts, however, recognize certain enforceable "preliminary agreements" that may bind the parties without comprising a complete contract. *Arcadian Phosphates Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989) (citing *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987)).

■ The first type of binding preliminary agreement (a so-called "Type I" agreement) is a written document that sets out in sufficient detail all elements of the agreement, but nevertheless contains a clause asserting that the document is to be re-drafted. Such agreements are wholly binding on the parties just as a completed contract would be. *Arcadian Phosphates Inc.,* 884 F.2d at 72. *cf. Tymon,* 16 N.Y.2d at 298, 266 N.Y.S.2d 357, 213 N.E.2d 661.

■ "The key, of course, is the intent of the parties." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998). In judging intent, courts are instructed to look to the language of the agreement, the context of the negotiations, the existence of open terms, partial performance, and the necessity of putting the agreement in final form. *Arcadian Phosphates Inc.,* 884 F.2d at 72.

■ Were the final sentence of the Letter of Intent (expressing the parties' intentions to deal in good faith and draft a complete contract in the future) the only factor weighing against a finding that no contract had been formed, plaintiffs' argument might be worthy of extended consideration. However, the Letter of Intent is not a completed contract that merely awaits redrafting; it omits several key ele-

ments, not least of which is how defendants were to be paid for the 107 Parcel and when it was to be transferred. The same omissions that weigh against a finding that the Letter satisfies the Statute of Frauds weigh equally heavily against plaintiffs' contention that the Letter was a final contract.

The other factors listed in *Arcadian Phosphates*—the context of the negotiations, the partial performance, and the parties' need to memorialize any contract for the sale of land in writing—further support this conclusion. The parties were hardly at a point where the project to develop three casinos in two counties could be considered ready for implementation.. Dealings between the various players continued for several more months before they collapsed. Moreover, the parties never drafted the necessary final written agreement, stating the material terms of the agreement, in order to satisfy the Statute of Frauds. For these reasons, insofar as the transfer of the 107 Parcel is concerned, the Letter of Intent is not a binding "Type I" agreement under *Arcadian Phosphates.*

A second type of binding preliminary agreement may be formed even by a "concededly incomplete agreement"—a written document lacking major elements of a complete agreement—if the parties intend to be so bound. *Id.* Such "Type II" agreements do not bind the parties to perform all terms as a completed agreement would, but rather requires that the parties continue to negotiate in good faith and within the conditions of the preliminary writing. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998). A preliminary "agreement to agree" of the second type may contemplate future transactions in land, because the Statute of Frauds does not apply to Type II preliminary agreements. *Brown v. Cara,* 420 F.3d 148, 159 (2d Cir.2005). Indeed, in an analogous case, the Second Circuit held that a preliminary memorandum of understanding would require a party to continue good-faith negotiations after the memorandum was signed. *Id.*

However, a review of the record reveals no basis for concluding that the Petri Defendants failed to negotiate. Plaintiffs make no such allegation; indeed, they do not even argue that a Type–II agreement was formed. They rely on *Arcadian Phosphates* for the proposition that a completed "Type–I" agreement was reached.

With good reason: there is not a scintilla of evidence that plaintiffs attempted to engage in additional negotiations over anything following May 1. Rather, it is clear from Simermeyer's letters that he viewed the deal as "done" and all relevant terms as agreed (if not written down). He demanded, not further negotiations, but that Petri perform unwritten terms of the purported agreement! There is no basis for concluding that Petri was in breach of an agreement to conduct further negotiations or dealings when no additional negotiations were sought by plaintiffs—just performance of a deal they thought was already negotiated.

In sum, the failure of the Letter of Intent to satisfy the Statute of Frauds, taken with the absence of any reason to enforce the incomplete agreement, leads to the conclusion that no binding agreement to transfer the 107 Parcel existed. Summary judgment on that issue is granted in favor of the Petri defendants.

### 2. The 106 Parcel

I now turn to the circumstances surrounding the transfer of the 106 Parcel. If I were only faced with the question of whether a contract existed that would satisfy the Statute of Frauds, the matter would be simple—for the reasons laid out

at length above, the Letter of Intent is a facially insufficient document. However, the absence of a complete written agreement did not stop the parties from taking steps to consummate part of their deal: Ancestral transferred title to the 106 Parcel to the Nation and plaintiffs (really, Carruthers) parted with $550,000. The question that remains is whether Petri made additional oral promises to reduce or clear the ABC Pacific mortgage, and whether those promises are enforceable.

Plaintiffs, in their complaint, assert that Petri orally promised to convey clear title to the 106 Parcel, or else to pay off the mortgage soon after the transfer. *See* Cmplt. ¶ 122; Carruthers Decl. I, ¶ 9. In light of the terms of the Letter of Intent, which are contrary to those allegations, plaintiffs have modified their argument. They now assert that Petri promised to "attempt to reduce" the mortgage to approximately $1.5 million, and to indemnify plaintiffs in the event that it could not be so reduced. Carruthers Decl.II, ¶ 39.

Carruthers characterized this as a promise to "ensure" that clear title passed to the Unkechaugs. *Id.* However, it is plainly nothing of the sort. The first arrangement would have required Petri to provide clear title. The second—the one that is memorialized in the Letter of Intent, and the one that Carruthers now claims is the deal—places the burden of clearing up the mortgage squarely on the plaintiffs.

Nothing in the record supports plaintiffs' claim that the Petri Defendants promised to clear up the mortgage. The Letter of Intent contains no provision binding Ancestral to settle the mortgage, or even to make any effort to reduce the $3.5 million amount to $1.5 million. The Letter states only that the Petri defendants agree to indemnify the Nation and Springhawk for any amount in excess of $1.5 million paid to satisfy the mortgage.

The term "indemnify" means "to reimburse another for a loss suffered because of a third party's act or default." *Black's Law Dictionary* 772 (7th ed.1999). Assuming (as I must) that the parties meant what they wrote, Ancestral's obligation to indemnify Springhawk places the burden of clearing up the encumbrance on plaintiffs, not on the Petri Defendants. An obligation to "reimburse" any cost in excess of $1.5 million incurred to settle the mortgage would be meaningless if Petri were in fact contractually obligated to advance the money needed to clear the mortgage.

Of course, Ancestral's written promise to indemnify plaintiffs for amounts expended in excess of $1.5 million makes far more sense if Petri in fact made oral representations that he thought the mortgage could be settled (i.e., reduced) to $1.5 million from $3.5 million. And Petri candidly admits to having made such statements frequently:

Q: Did you continue to negotiate with Mr. Newberg or anyone else on behalf of AP Pacific Realty [sic] to settle this thing?

A: Yes.

Q: What time?

A: It was an ongoing situation.

. . .

Q: Did you ever tell Mr. Carruthers that this mortgage could be settled for $1.5 million?

. . .

A: Almost every time I talked to him, I guess.

Petri Dep. at 125:13–126:13. However, Petri's saying that he thought, or even was sure, that the mortgage could be reduced to $1.5 million is a far cry from his entering into a contractual undertaking to settle the mortgage for that, or any, amount.

The Letter of Intent is the only evidence before me of the deal between Ancestral and plaintiffs, and that deal obligated *plaintiffs* to get rid of the mortgage if they wanted clear title to the parcel—with Petri promising to pay them back for any amount more than $1.5 million that it might cost.

This interpretation is not only consistent with the terms of the only written agreement between the parties, it is also consistent with the fact that title to the 106 Parcel passed to the Unkechaug before the mortgage was paid off—i.e., title passed with the encumbrance intact! At the time they took title, plaintiffs had no assurance from ABC that it would accept a proposal to reduce the mortgage—Petri's statements notwithstanding. So they decided to take title without knowing whether Petri was correct, but hedged their risk by making Ancestral, Petri's company, responsible for any payment over the $1.5 million that he thought would suffice to clear up the encumbrance.

There is no evidence that a new deal was formed orally after the Letter of Intent was signed. As late as May 9, after the $549,000 was transferred and title to the land deeded to the Unkechaugs, Simermeyer wrote a letter to Carruthers reminding him of the million mortgage and stating, "Chuck has stated that any amount over 2.5 million [sic] to settle the mortgage, he will pay." And in his declaration in support of the motion, Carruthers admits that the parties' agreement agreed with the terms stated in the Letter of Intent. Carruthers Decl. I, ¶ 9.

It is not clear from the record whether Petri promised to use his best efforts to reduce the amount of the mortgage, or simply assured plaintiffs that ABC would take less money to pay off the mortgage. Nothing was committed to writing, although it appears, even from Petri's own testimony, that he made repeated statements about ABC Pacific's willingness to take less than face value to settle the mortgage.

 Moreover, even if such a promise were made and were found to be enforceable (which it is not, since it contradicts a promise made in a signed writing), there is nothing in the record suggesting that Ancestral or Petri breached the promise or that plaintiffs suffered any damage if he did. It is true that the mortgage was never reduced to $1.5 million, and the record does not reveal when Petri stopped negotiating with ABC. However, it is equally apparent that plaintiffs never had $1.5 million—or any money at all, over and above the $549,000—that could have been applied toward paying off the mortgage if ABC had in fact agreed to reduce it. Lacking the ability to perform their side of the deal, plaintiffs can hardly be heard to complain that Petri failed to live up to his alleged agreement (nowhere memorialized) to bargain the mortgage down.

One could speculate about what occurred between early May and late July (when, according to Simermeyer, Carruthers was already planning to sue the Nation) that led to the collapse of an apparently simple plan to clear title to the 106 Parcel: lack of funds, intra-party conflict, or even the parties' realization that the underlying gambling enterprise was in fact illegal. However, we are beyond the point where speculation can replace admissible evidence. Where, as here, plaintiffs offer no testimony or documents to support their claim that Petri, breached the only obligation he undertook—his obligation to indemnify plaintiffs if they had to spend more than $1.5 million to pay off the ABC mortgage—Petri is entitled to summary judgment dismissing plaintiffs' claim for breach of contract.

## B. Fraud

■ In the alternative, plaintiffs contend that defendants are liable for making a fraudulent promise to them, which statement induced them to part with their money and take title to the parcel that was eventually lost in foreclosure.

■ "The elements of a cause of action for fraud are a representation concerning a material fact, falsity of that representation, scienter, reliance and damages." *Stuart Silver Assoc., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 98, 665 N.Y.S.2d 415 (1st Dept.1997). The misrepresentation at the heart of plaintiffs' claim is not one of fact, but one of future intent: Petri's alleged promise to ensure that the Unkechaug would take clear title to the Apollo mall.

■ As a general rule, the failure to perform a contractual promise gives rise to a cause of action for breach, not fraud. *See, e.g., Vista Co. v. Columbia Pictures Inds.*, 725 F.Supp. 1286, 1294 (S.D.N.Y. 1989). There is a line of New York Court of Appeals cases holding that a cause of action for fraud in the inducement will lie when "a contractual promise [is] made with the undisclosed intention not to perform it." *Sabo v. Delman*, 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957). Such a promise must be "collateral to [the contract], but which was the inducement for the contract." *Deerfield Commc'ns. Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986).

The Second Circuit, adhering to this distinction, requires a plaintiff who alleges this form of fraud in the inducement must "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996); *see also Frontier–Kemper Constructors, Inc. v. American Rock Salt Co.*, 224 F.Supp.2d 520, 527–29 (W.D.N.Y.2002) (collecting cases).

A representation that the ABC mortgage could be cleared for $1.5 million, and that Petri would use his best efforts to help the plaintiffs get the mortgage reduced to that amount, may be sufficiently "collateral" to the underlying agreement to give rise to a claim of fraud, if those representations were made to induce plaintiff to enter into the deal (i.e., to part with his money).

But I need not reach that question. It is undisputed that the parties entered into a written agreement—the Letter of Intent—that contained no such representation. The Letter of Intent bound Petri to indemnify plaintiffs if the mortgage could not be reduced to the desired amount. Having signed such an agreement—and having done so in connection with a transfer of land, which is subject to the Statute of Frauds—plaintiffs cannot, as a matter of law, establish that they reasonably relied on Petri's oral representations to their detriment. The document they signed clearly anticipated the possibility that the mortgage might not be paid off for $1.5 million—otherwise there would have been no promise to indemnify! As explained above, plaintiffs have no claim that Petri breached his agreement to indemnify, because they offer no evidence that they ever had the wherewithal to pay off a reduced mortgage, let alone that anyone failed to get the mortgage amount reduced after May 1, 2002.

■ Moreover, plaintiffs offer no evidence that Petri made any sort of representation with knowledge of its falsity—or,

in this particular case, with the intent not to perform. Evidence about a defendant's state of mind must be proffered to survive summary judgment, and the burden of producing evidence regarding the defendant's fraudulent intent lies squarely on the plaintiffs. *U.S. East Telecommunications, Inc. v. U.S. West Communications Servs., Inc.*, 38 F.3d 1289, 1302 (2d Cir. 1994). The record before this court contains no such evidence.

Petri contends that he was willing—at least as of May 1—to work with plaintiffs to settle the mortgage. Since he had signed a Letter of Intent in which he agreed to indemnity plaintiffs for every penny above that amount that they had to pay to get rid of the mortgage, he would have been a fool not to do everything possible to help plaintiffs reduce the amount needed to clear the encumbrance. Plaintiffs proffer no evidence that Petri did not mean to make good on his representation. The fact that ABC never agreed to reduce the amount it would take in satisfaction of the mortgage does not prove that Petri did not intend to help plaintiffs get the mortgage reduced at the time he offered to do so.

■ Moreover, since plaintiffs do not offer any evidence that they ever had so much as a dime available to use to pay off the mortgage—and it is quite apparent that they had no funds available for that purpose (or, as far as this court can tell, for any other)—they have not proved, and cannot prove, that they suffered any damage as a result of Petri's alleged "misrepresentation" about the willingness of ABC to accept less than face value of the mortgage to clean up the encumbrance on the property.

The Petri Defendants are awarded summary judgment dismissing plaintiffs' fraud claim.

### C. Unjust Enrichment

In light of the above discussion, I dismiss plaintiffs' twelfth cause of action—unjust enrichment against 3D Associates and Barbanti—*sua sponte*. No party seems to have moved for summary judgment on these claims, but with all claims against Petri dismissed, it is clear that the twelfth cause of action cannot stand.

■ The elements of such a claim are the enrichment of the defendant at the expense of the plaintiff where "it would be against equity and good conscience to permit defendant to retain the benefit." *Lake Minnewaska Mountain Houses Inc. v. Rekis*, 259 A.D.2d 797, 686 N.Y.S.2d 186 (3d Dept.1999).

■ The essence of plaintiffs' claim is that 3D and Barbanti were enriched unjustly because the 107 Parcel, presently held by 3D Associates, should have been transferred to the plaintiffs. But Plaintiffs' contention that it had a contractual right to take title to the 107 Parcel has no support in the record or at law, as discussed above. Therefore, there is no basis for plaintiffs' allegation that the Barbanti Defendants were unjustly enriched by obtaining or retaining title to the 107 Parcel.

### D. Actions in Furtherance of Agency

■ I also, *sua sponte,* dismiss plaintiffs' Count IX, which alleges that the Petri defendants are liable for actions they allegedly took in furtherance of some purported agent-principal relationship with the Flaum defendants. Since there is absolutely no evidence that Petri was acting as an agent of Flaum in his dealings with Carruthers, there is no basis for this claim, either.

### III. The Young Defendants

Defendant Alan H. Young and his law firm, Lindenbaum & Young (together, the

"Young defendants") move for summary judgment on the only claim asserted against them: that Young promised to serve as escrow agent for the Carruthers and Petri land deal, then breached his fiduciary duty to plaintiffs by transferring the 106 Parcel while still encumbered with a mortgage, Cmplt ¶ 158, and by spending Carruthers' $550,000 in a manner inconsistent with the terms of the Petri–Carruthers contract. Cmplt ¶ 159.

■■■■■ An escrow agreement is "an agreement pursuant to which funds are delivered to a third-party depositary, the grantor relinquishes control over the funds, and the funds are to be delivered to a third party conditioned upon the performance of some act or the occurrence of some event." *Great Am. Ins. Co. v. Canandaigua Nat. Bank & Trust Co.*, 23 A.D.3d 1025, 1027, 804 N.Y.S.2d 177 (4th Dep't 2005). An escrow agreement imposes a fiduciary duty on the escrow agent to both parties, "not to deliver the escrow ... except upon strict compliance with the conditions imposed." *Id.* at 1028, 804 N.Y.S.2d 177 (citing *Farago v. Burke*, 262 N.Y. 229, 233, 186 N.E. 683 (1933)).

■■■■ As I have already concluded that the transfer of the 106 Parcel was not conditioned on the satisfaction of the mortgage—rather, title was passed pursuant to an agreement that explicitly contemplated that title would pass while the Parcel was still encumbered—plaintiffs' first argument must be discounted.

■■■■ So, I fear, must the second. In order for Young to be liable for breach of fiduciary duty, I must conclude that there was some agreement concerning the uses to which the $550,000 was to be put. Car-

ruthers contends that the money was supposed to be used only to "clear title" (which, I assume, means pay down the mortgage), acquire insurance, and serve other purposes of the casino project, with any excess amount (!) to be returned to plaintiffs.[15] Apparently, Carruthers believed (and still believes) that the Unkechaug were not going to pay for the land they were acquiring. That this belief is utter nonsense ought to be enough to defeat the motion.

But there is no evidence that Young was ever instructed to use the $550,000 in the manner Carruthers suggests.

The evidence discloses a grand total of one communication between plaintiffs (through Simermeyer) and Young: the misdated " April 1" letter. In this document, Simermeyer told Young that he was depositing funds "pursuant to the direction of *your* client Chuck Petri" to be released "to close title to the property." (emphasis added). Simermeyer's acknowledgement that Petri was Young's client rebuts Carruthers' unsupported allegation that Young was plaintiffs' agent. The letter also stated that the 106 Parcel could be transferred to the Nation in one of several ways. But the letter contains no instructions about how Young was to disburse the $550,000 after it was used to "close title to the property." Young took his instructions on that subject from Petri. He says so and Petri concurs, and there is no evidence to the contrary. In fact, Carruthers concedes that he had no direct contact with Young until well after the 106 Parcel transaction closed.

While Carruthers apparently believes that, pursuant to his agreement with Petri,

---

**15.** Carruthers never bothers to explain how his $550,000—less amounts used to clear up the IDA loan and acquire insurance—would have been sufficient to satisfy a reduced mort-

gage of $1.5 million. It is but another example of the utter inconsistency of plaintiffs' ever-changing arguments.

his money was to be expended in particular ways (although nothing in the Letter of Intent so stipulates), no claim for breach of fiduciary duty lies against Young unless Young was told about how the parties had agreed to use the money and given explicit instructions to apply the funds in that fashion. On this record, there is no evidence that anyone ever told him about Carruthers' delusions.

The Young defendants' motion for summary judgment dismissing plaintiffs' tenth cause of action is granted.

## IV. Defendant James Simermeyer (Causes of Action I, II, IV)

### A. Malpractice Claim

Finally, I turn to defendant James Simermeyer's motion for summary judgment on those claims remaining against him—all alleging legal malpractice based on his duty as counsel for Carruthers personally and as legal representative of Springhawk LLC.

Simermeyer contends that he never agreed to be Carruthers' personal lawyer, and never undertook to act as counsel of the Springhawk and Summerhawk joint ventures. Simermeyer also contends that the acted at all times within a standard of due care, given the rapid pace of the sale of the 106 and 107 Parcels. Carruthers disputes both contentions as well.

■■■■■ For a cause of action for legal malpractice to attach, an attorney-client relationship must have been formed by mutual assent. The fact that a lawyer becomes involved in a joint venture with others does not necessarily establish an attorney-client relationship with the other joint venturers. *Fleissler v. Bayroff,* 266 A.D.2d 34, 34, 698 N.Y.S.2d 19 (1st Dep't 1999). Rather, an attorney must enter into an "explicit undertaking to perform a specific task." *Sucese v. Kirsch,* 199 A.D.2d 718, 719, 606 N.Y.S.2d 60 (3d Dep't 1993).

■■■■■ Plaintiffs assert that Simermeyer made explicit undertakings at several points during his involvement. First, he agreed to act as counsel to the Springhawk and Summerhawk entities as part of the original operating agreements. Second, he allegedly made particular assurances at the May 1 meeting with Carruthers, Petri et al., that he would acquire title insurance and a master lease agreement for the parcels (or at least cause such to be acquired). Carr. Decl. in Supp. of Opp. to Simermeyer Motion for S.J. ¶ 33. Carruthers asserts that, without that assurance, he would not have been willing to invest his personal holdings in the venture. Carr. Decl. ¶ 40.

Simermeyer denies all of the above assertions, and claims that, in fact, it was he who relied on Carruthers (also an attorney) to look after his interests, as Carruthers, unlike Simermeyer, had experience in the world of casino gaming. However, he admits that he performed some legal work for the venture, and the paperwork in evidence bears this out. Simermeyer wrote numerous letters on behalf of Carruthers and Springhawk which indicate that, at times, he was holding himself out as counsel.

At best there is a genuine issue of fact on the point. I cannot dismiss the malpractice claim for lack of an attorney-client relationship.

■■■■■ Second, Simermeyer states that he was not involved in the lengthy negotiations between Carruthers and Petri, who concocted the various elements of the agreement on their own. Simermeyer Decl. ¶¶ 101–02. Plaintiffs do not dispute this; the only matter of contention appears to be what was (or was not) said at the May 1 meeting, where Simermeyer alleg-

edly promised to acquire title insurance on the 106 Parcel, as well as to draft a master lease (perhaps between Carruthers and the Nation as title holder or Springhawk as the operating entity, although Carruthers never explicitly so states) on both parcels.

I will (as I must) accept, for purposes of the instant motion, that Simermeyer assured Carruthers that he would both acquire title insurance for the 106 Parcel and draft a "master lease" between Carruthers and some unspecified party to protect Carruthers' interest in the "acreage" of both parcels. Nevertheless, Simermeyer is entitled to summary judgment dismissing the malpractice claim because, even if Simermeyer performed these undertakings, Carruthers would have lost his land and his money.

First, as to the 107 Parcel—plaintiff never took title to that parcel, and, as I have concluded, never had a contract entitling him to do so. Simermeyer did not commit malpractice by not insuring or drafting a master lease for a parcel of land that Carruthers never acquired and never had a contractual right to acquire.

Second, Carruthers does not explain how either title insurance (which is ordinarily procured prior to the passage of title) or the entering into a master lease for the 106 Parcel would have protected him from foreclosure by the holder of an unsatisfied mortgage. It is apparent to this court that there is no way either of those things would have prevented the foreclosure.

A master lease agreement is merely "a lease that controls later leases or subleases." *Black's Law Dictionary*, 899 (7th ed.1999). A master lease between Carruthers and the Nation would perhaps have provided Carruthers with leverage over the title holder—the Unkechaug—but would have done nothing to cut off the superior rights of the mortgage holder if it chose to foreclose (as ABC did).

Title insurance exists to protect a purchaser from defects in the chain of title that come to light after the transaction is completed. It is, therefore, purchased prior to the closing of the transaction. Here, all parties knew well in advance that the land was in fact encumbered, to the tune of $3.5 million, and that, under the best of circumstances, it would cost $1.5 million—or more—to get rid of the mortgage. Simermeyer's procurement of title insurance would not have changed any of that. No title insurer would have issued a policy representing that the land was not encumbered when the plaintiffs had already acknowledged that it WAS encumbered.

Additionally, if title insurance were important to Carruthers he could have elected not to close the transaction until it was procured. He chose to close despite the absence of title insurance. He has no claim for malpractice against Simermeyer for his own folly.

The "title insurance" claim is of course left over from the original complaint, which seemed to charge Simermeyer with failing to learn about the outstanding mortgage. But the evidence demonstrates beyond peradventure that Carruthers knew about the mortgage at the time the tribe took title to the property, and further knew they would be required to pay up to $1.5 million in additional funds to get rid of the mortgage. So the "title insurance" aspect of the malpractice claim really falls because the factual predicate for this lawsuit—Carruthers' supposed lack of knowledge that the ABC mortgage existed—turns out to be a fiction.

Simermeyer's motion for summary judgment is granted. What remains of claims I, II, and IV are dismissed.

## B. Rule 11 Sanctions.

Simermeyer also renews a motion, originally brought by all the Simermeyer defendants (including those who have already been dismissed from this action—Harry Wallace and the non-existent law firm of Simermeyer & Wallace), for sanctions pursuant to Rule 11. This motion is predicated on the arguments made in the original motion concerning the non-existence of the Simermeyer and Wallace law firm. While the court dismissed the amended complaint's claims against Wallace and the non-existent law firm in *Carruthers II*, I also denied the motion to sanction plaintiffs for asserting those claims. I did so because defendants failed to comply with the safe harbor provisions of Rule 11. *See* 388 F.Supp.2d at 381.

 In effect, the renewed motion (made this time solely by Simermeyer, since he is the only defendant left to move) is a motion to reconsider the court's previous ruling. But the prior motion was denied for technical reasons. That technicality cannot be cured at this point, seven months after the claims against Simermeyer and Wallace and Wallace himself were dismissed.[16] At this point, there are no claims against Simermeyer & Wallace, or against Wallace himself, left to withdraw, since they were all dismissed last year. Simermeyer thus received a complete "judicial rejection of the offending contention" concerning the non-existent law firm in September, 2005. Renewing defendants'

motion months after prevailing on the merits leaves plaintiffs without an opportunity to "withdraw" the challenged pleading.

Simermeyer did not suggest in his motion that sanctions should be awarded to him because of plaintiff's continued pursuit of malpractice claims against him that were predicated on a factually bogus assertion—Carruthers' purported lack of knowledge about the ABC mortgage prior to his consummating the purchase of the 106 Parcel. In the opinion of this court, such a motion would have had considerable merit. Unfortunately, it is too late for Simermeyer to make the motion now, since the claim has been dismissed. Since the 1993 revision to Rule 11, a Rule 11 motion must be filed so as to give the opposing party an opportunity to withdraw the challenged claim: "the 'safe harbor' provision functions as a practical time limit, and motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir.2003). Other circuits have imposed similar restrictions on post-judgment motions for sanctions. *See Brickwood Contractors, Inc. v. Datanet Eng., Inc.*, 369 F.3d 385, 389 (4th Cir.2004); *Ridder v. City of Springfield*, 109 F.3d 288, 297 (6th Cir.1997) ("this service and filing [of a Rule 11 motion] must occur prior to final

---

**16.** Moreover, it appears that Simermeyer failed to comply with the safe harbor provision for a second time when he renewed the motion. Plaintiffs assert (and there is no evidence to the contrary) that they did not receive the renewed sanctions motion 21 days before the motion was submitted to the Court, as required by Rule 11. Neither party has offered evidence about when the motion was served on plaintiffs, although the motion itself is dated May 8—the same date it was filed

with the Clerk of the Court. I assume that Simermeyer contends that the motion I denied gave plaintiffs the requisite notice for purposes of Rule 11(c)(1)(A). However, as was discussed extensively above, the Second Circuit requires strict compliance with the procedural requirements of Rule 11. Filing the same motion twice, without giving plaintiff an opportunity to withdraw the challenged contention, does not fall within the letter of the safe harbor procedure.

judgment or judicial rejection of the offending contention.").

The Simermeyer Motion for Sanctions is denied.

## Conclusion

For the foregoing reasons, the complaint is dismissed in its entirety as to all defendants except the Flaum Defendants, with prejudice and with taxable costs to defendants.

The court will dispose of the claims against the Flaum defendants (and their motion for sanctions) as soon as plaintiffs supply the missing information about service of the Rule 11 motion to the court.

This constitutes the decision and order of the court.